[No. S109125. Aug. 2, 2004.]

SAN DIEGO UNIFIED SCHOOL DISTRICT, Plaintiff and Respondent, v. COMMISSION ON STATE MANDATES, Defendant and Appellant; CALIFORNIA DEPARTMENT OF FINANCE, Real Party in Interest and Appellant.

860

862

864

## Counsel

Paul M. Starkey, Camille Shelton and Katherine A. Tokarski for Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Pamela Smith-Steward, Chief Assistant Attorney General, Andrea Lynn Hoch, Assistant Attorney General, Louis R. Mauro and Susan R. Oie, Deputy Attorneys General, for Real Party in Interest and Appellant.

Jo Anne Sawyerknoll, Tad Seth Parzen, Jose A. Gonzales and Arthur M. Palkowitz for Plaintiff and Respondent.

Lozano Smith, Diana McDonough, Harold M. Freiman, Jan E. Tomsky and Gregory A. Floyd for California School Boards Association Education Legal Alliance as Amicus Curiae on behalf of Plaintiff and Respondent.

Steven M. Woodside, County Counsel (Sonoma) as Amicus Curiae on behalf of Plaintiff and Respondent.

OPINION

GEORGE, C. J.—Article XIII B, section 6, of the California Constitution provides: "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service . . . ."[1] (Hereafter article XIII B, section 6.)

Plaintiff San Diego Unified School District (District), like all other public school districts in the state, is, and was at the time relevant in this proceeding, governed by statutes that regulate the expulsion of students. (Ed. Code, § 48900 et seq.) Whenever an expulsion recommendation is made (and before a student may be expelled), the District is required by Education Code section 48918 to afford the student a hearing with various procedural protections—including notice of the hearing and the right to representation by counsel, preparation of findings of fact, notices related to any expulsion and the right of appeal, and preparation of a hearing record. Providing these procedural protections requires the District to expend funds, for which the District asserts a right to reimbursement from the state pursuant to article XIII B, section 6, and implementing legislation, Government Code section 17500 et seq.

We granted review to consider two questions: (1) Are the hearing costs incurred as a result of the *mandatory* actions related to expulsions that are compelled by Education Code section 48915 fully reimbursable—or are those hearing costs reimbursable only to the extent such costs are attributable to hearing procedures that exceed the procedures required by federal law? (2) Are any hearing costs incurred in carrying out expulsions that are *discretionary* under Education Code section 48915 reimbursable? After we granted review and filed our decision in *Department of Finance v. Commission on State Mandates (Kern High School Dist.)* (2003) 30 Cal.4th 727 [134 Cal.Rptr.2d 237, 68 P.3d 1203] (*Kern High School Dist.*), we added the following preliminary question to be addressed: Do the Education Code

---

[1] The provision continues: "except that the Legislature may, but need not, provide such subvention of funds for the following mandates: [¶] (a) Legislative mandates requested by the local agency affected; [¶] (b) Legislation defining a new crime or changing an existing definition of a crime; or [¶] (c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975." (Cal. Const., art. XIII B, § 6.)

statutes cited above establish a "new program" or "higher level of service" under article XIII B, section 6? Finally, we also asked the parties to brief the effect of the decision in *Kern High School Dist., supra,* 30 Cal.4th 727, on the present case.

■ We conclude that Education Code section 48915, insofar as it compels suspension and mandates a recommendation of expulsion for certain offenses, constitutes a "higher level of service" under article XIII B, section 6, and imposes a reimbursable state mandate for *all* resulting hearing costs—even those costs attributable to procedures required by federal law. In this respect, we shall affirm the judgment of the Court of Appeal.

■ We also conclude that *no* hearing costs incurred in carrying out those expulsions that are *discretionary* under Education Code section 48915— including costs related to hearing procedures claimed to exceed the requirements of federal law—are reimbursable. As we shall explain, to the extent that statute makes expulsions discretionary, it does not reflect a new program or a higher level of service related to an existing program. Moreover, even if the hearing *procedures* set forth in Education Code section *48918* constitute a new program or higher level of service, we conclude that *this* statute does not trigger any right to reimbursement, because the hearing provisions that assertedly exceed federal requirements are merely incidental to fundamental federal due process requirements and the added costs of such procedures are de minimis. For these reasons, we conclude such hearing provisions should be treated, for purposes of ruling upon a request for reimbursement, as part of the nonreimbursable underlying *federal* mandate and not as a state mandate. Accordingly, we shall reverse the judgment of the Court of Appeal insofar as it compels reimbursement of any costs incurred pursuant to discretionary expulsions.

## I

### A. *Education Code sections 48918 and 48915*

We first describe the relevant provisions of two statutes—Education Code sections 48918 and 48915—pertaining to the expulsion of students from public schools.

Education Code section 48918 specifies the right of a student to an expulsion hearing and sets forth procedures that a school district must

follow when conducting such a hearing. (Stats. 1990, ch. 1231, § 2, pp. 5136–5139.)[2]

■ In identifying the right to a hearing, subdivision (a) of Education Code, section 48918, declares that a student is "entitled" to an expulsion hearing within 30 days after the school principal determines that the student has committed an act warranting expulsion.[3] *In practical effect, this means that whenever a school principal makes such a determination and recommends to the school board that a student be expelled, an expulsion hearing is mandated.*[4]

In specifying the substantive and procedural requirements for such an expulsion hearing, Education Code section 48918 sets forth rules and procedures, some of which, the parties agree, codify requirements of federal due process and some of which may exceed those requirements.[5] These rules and procedures govern, among other things, notice of a hearing and the right to representation by counsel, preparation of findings of fact, notices related to the expulsion and the right of appeal, and preparation of a hearing record. (See § 48918, subds. (a) through former subd. (j), currently subd. (k).)

---

[2] For purposes of our present inquiry, Education Code, section 48918, at the time relevant here (mid-1993 through mid-1994) read essentially as it had for the prior decade, and as it has in the ensuing decade. That provision first was enacted in 1975 (see Stats. 1975, ch. 1253, § 4, pp. 3277–3278) as Education Code, former section 10608. (This enactment apparently was a response to the United States Supreme Court's decision in *Goss v. Lopez* (1975) 419 U.S. 565, 581 [42 L.Ed.2d 725, 95 S.Ct. 729] (*Goss*) [recognizing due process requirements applicable to public school students who are suspended for more than 10 days].) The statute was renumbered as Education Code, former section 48914 in 1976 (Stats. 1976, ch. 1010, § 2, pp. 3589–3590) and was substantially augmented in 1977 (Stats. 1977, ch. 965, § 24, pp. 2924–2926). After relatively minor amendments in 1978 and 1982, the section in 1983 was substantially restated, further augmented, and renumbered as Education Code section 48918 (Stats. 1983, ch. 498, § 91, p. 2118). Amendments adopted in 1984 and 1988 made relatively minor changes, and further similar modifications were made in 1990, reflecting the version of the statute here at issue. Subsequent amendments in 1995, 1996, 1998, and 1999 made further changes that are irrelevant to the issue presented in the case now before us.

[3] The provision reads: "The pupil shall be entitled to a hearing to determine whether the pupil should be expelled. An expulsion hearing shall be held within 30 schooldays after the date the principal or the superintendent of schools determines that the pupil has committed any of the acts enumerated in Section 48900 . . . ." (Ed. Code, § 48918, subd. (a).) (Subdivision (b) of section 48900 presently includes—as it did at the time relevant here—the offense of possession of a firearm.)

[4] Of course, if a student does not invoke his or her entitlement to such a hearing, and instead waives the right to such a hearing, the hearing need not be held.

[5] See *Goss, supra,* 419 U.S. 565, 581; *Gonzales v. McEuen* (C.D.Cal. 1977) 435 F.Supp. 460, 466–467 (concluding that former Education Code section 10608 [current § 48918] met federal due process requirements pertaining to expulsions from public schools); 7 Witkin, Summary of California Law (9th ed. 1988), Constitutional Law, section 549, page 754 (noting that Education Code section 48918 and related legislation were enacted in response to the decision in *Goss*).

■ The second statute at issue in this matter is Education Code section 48915. Discrete subdivisions of this statute address circumstances in which a principal *must* recommend to the school board that a student be expelled, and circumstances in which a principal *may* recommend that a student be expelled.

First, there is what the parties characterize as the "mandatory expulsion provision," Education Code section 48915, former subdivision (b). As it read during the time relevant in this proceeding (mid-1993 through mid-1994), this subdivision (1) compelled a school principal to *immediately suspend* any student found to be in possession of a firearm at school or at a school activity off school grounds, and (2) mandated a *recommendation* to the school district governing board that the student be *expelled*. The provision further required the governing board, upon confirmation of the student's knowing possession of a firearm, either to expel the student or "refer" him or her to an alternative education program housed at a separate school site.[6] (Compare this former provision with *current* Ed. Code, § 48915, subds. (c), (d).)[7]

---

[6] An earlier and similar, albeit broader, version of the provision—extending not only to possession of firearms but also to possession of explosives and certain knives—existed briefly and was effective for approximately two and one-half months in late 1993. That initial statute, former section 48915, subdivision (b) (as amended Stats. 1993, ch. 1255, § 2, pp. 7284–7285), which was effective only from October 11, 1993 through December 31, 1993, provided: "The principal or the superintendent of schools shall immediately suspend pursuant to Section 48911, and shall recommend to the governing board the expulsion of, any pupil found to be in possession of a firearm, knife of no reasonable use to the pupil, or explosive at school or at a school activity off school grounds. The governing board shall expel that pupil or, as an alternative, refer that pupil to an alternative education program, whenever the principal or the superintendent of schools and the governing board confirm that: [¶] (1) The pupil was in knowing possession of the firearm, knife, or explosive. [¶] (2) Possession of the firearm, knife of no reasonable use to the pupil, or explosive was verified by an employee of the school district. [¶] (3) There was no reasonable cause for the pupil to be in possession of the firearm, knife, or explosive."

As subsequently amended by Statutes 1993, chapter 1256, section 2, pages 7286–7287, effective January 1, 1994, Education Code section 48915, former subdivision (b), read: "The principal or the superintendent of schools shall immediately suspend, pursuant to Section 48911, any pupil found to be in possession of a firearm at school or at a school activity off school grounds and shall recommend expulsion of that pupil to the governing board. The governing board shall expel that pupil or refer that pupil to a program of study that is appropriately prepared to accommodate students who exhibit discipline problems and is not provided at a comprehensive middle, junior, or senior high school or housed at the schoolsite attended by the pupil at the time the expulsion was recommended to the school board, whenever the principal or superintendent of schools and the governing board confirm the following: [¶] (1) The pupil was in knowing possession of the firearm. [¶] (2) An employee of the school district verifies the pupil's possession of the firearm."

[7] The current subdivisions of Education Code section 48915 set forth a list of mandatory expulsion conduct broader than that set forth in former subdivision (b), and require a school board both to *expel and refer* to other institutions all students found to have committed such conduct. The present subdivisions read: "(c) The principal or superintendent of schools shall

This provision, as it read at the time relevant here, did not mandate expulsion per se[8]—but it *did* require immediate suspension followed by a mandatory expulsion recommendation (and it provided that a student found by the governing board to have possessed a firearm would be removed from the school site by limiting disposition to either expulsion or "referral" to an alternative school). Moreover, as noted above, whenever expulsion is recommended a student has a right to an expulsion hearing. Accordingly, it is appropriate to characterize the former provision as *mandating* immediate suspension, a recommendation of expulsion, *and hence, an expulsion hearing.* For convenience, we accept the parties' description of this aspect of Education Code section 48915 as constituting a "mandatory expulsion provision."

The second aspect of Education Code section 48915 relevant here consists of what we shall call the "discretionary expulsion provision." (*Id.*, former subd. (c), subsequently subd. (d), currently subd. (e).) During the period relevant in this proceeding (as well as currently), this subdivision of Education Code section 48915 recognized that a principal possesses *discretion* to recommend that a student be expelled for specified conduct other than firearm possession (conduct such as damaging or stealing school property or private property, using or selling illicit drugs, receiving stolen property, possessing tobacco or drug paraphernalia, or engaging in disruptive behavior). The former provision (like the current provision) further specified that the school district governing board "may" order a student expelled upon finding that the

immediately suspend, pursuant to Section 48911, and shall recommend expulsion of a pupil that he or she determines has committed any of the following acts at school or at a school activity off school grounds: [¶] (1) Possessing, selling, or otherwise furnishing a firearm. This subdivision does not apply to an act of possessing a firearm if the pupil had obtained prior written permission to possess the firearm from a certificated school employee, which is concurred in by the principal or the designee of the principal. This subdivision applies to an act of possessing a firearm only if the possession is verified by an employee of a school district. [¶] (2) Brandishing a knife at another person. [¶] (3) Unlawfully selling a controlled substance listed in Chapter 2 (commencing with Section 11053) of Division 10 of the Health and Safety Code. [¶] (4) Committing or attempting to commit a sexual assault as defined in subdivision (n) of Section 48900 or committing a sexual battery as defined in subdivision (n) of Section 48900. [¶] (5) Possession of an explosive. [¶] (d) The governing board shall order a pupil expelled upon finding that the pupil committed an act listed in subdivision (c), and shall refer that pupil to a program of study that meets all of the following conditions: [¶] (1) Is appropriately prepared to accommodate pupils who exhibit discipline problems. [¶] (2) Is not provided at a comprehensive middle, junior, or senior high school, or at any elementary school. [¶] (3) Is not housed at the schoolsite attended by the pupil at the time of suspension." (Stats. 2001, ch. 116 § 1.)

[8] As the Department of Finance observed in an August 22, 1994, communication to the *Commission on State Mandates in this matter,* "nothing in [Education Code section 48915] . . . requires a district governing board or a county board of education to expel a pupil," and even "unauthorized and knowing possession of a firearm, does not result in mandated expulsion. Section 48915 subdivision (b) provides for the choice of the governing board to either expel the pupil in possession of a firearm, or refer the pupil to an alternative program of study. . . ."

student, while at school or at a school activity off school grounds, engaged in such conduct.[9]

---

[9] Education Code, section 48915, former subdivision (c) (as amended Stats. 1992, ch. 909, § 3, p. 4226; amended and redesignated as former subd. (d) by Stats. 1993, ch. 1255, § 2, pp. 7284–7285; further amended Stats. 1993, ch. 1256, § 2, p. 7287, and Stats. 1994, ch. 1198, § 7, p. 7271) provided, at the time relevant here: "Upon recommendation by the principal, superintendent of schools, or by a hearing officer or administrative panel appointed pursuant to subdivision (d) of Section 48918, the governing board *may* order a pupil expelled upon finding that the pupil violated subdivision (f), (g), (h), (i), (j), (k), or (l) of Section 48900, or Section 48900.2 or 48900.3, and either of the following: [¶] (1) That other means of correction are not feasible or have repeatedly failed to bring about proper conduct. [¶] (2) That due to the nature of the violation, the presence of the pupil causes a continuing danger to the physical safety of the pupil or others." (Italics added.)

At the time relevant here, subdivisions (f) through (l) of Education Code section 48900 (as amended Stats. 1992, ch. 909, § 1, pp. 4224–4225; Stats. 1994, ch. 1198, § 5, pp. 7269–7270) provided: "A pupil shall *not* be suspended from school or recommended for expulsion *unless* the superintendent or the principal of the school in which the pupil is enrolled determines that the pupil has: [¶] . . . [¶] (f) Caused or attempted to cause damage to school property or private property. [¶] (g) Stolen or attempted to steal school property or private property. [¶] (h) Possessed or used tobacco, or any products containing tobacco or nicotine products . . . . However, this section does not prohibit use or possession by a pupil of his or her own prescription products. [¶] (i) Committed an obscene act or engaged in habitual profanity or vulgarity. [¶] (j) Had unlawful possession of, or unlawfully offered, arranged, or negotiated to sell any drug paraphernalia, as defined in Section 11014.5 of the Health and Safety Code. [¶] (k) Disrupted school activities or otherwise willfully defied the valid authority of supervisors, teachers, administrators, school officials, or other school personnel engaged in the performance of their duties. [¶] (l) Knowingly received stolen school property or private property." (Italics added.)

At the time relevant here, Education Code, section 48900.2 (Stats. 1992, ch. 909, § 2, p. 4225) provided: "In addition to the reasons specified in Section 48900, a pupil may be suspended from school or recommended for expulsion if the superintendent or the principal of the school in which the pupil is enrolled determines that the pupil has committed sexual harassment as defined in Section 212.5. [¶] For the purposes of this chapter, the conduct described in Section 212.5 must be considered by a reasonable person of the same gender as the victim to be sufficiently severe or pervasive to have a negative impact upon the individual's academic performance or to create an intimidating, hostile, or offensive educational environment. This section shall not apply to pupils enrolled in kindergarten and grades 1 to 3, inclusive."

Education Code, section 48900.3 (Stats. 1994, ch. 1198, § 6, p. 7270), at the time relevant here, provided: "In addition to the reasons specified in Sections 48900 and 48900.2, a pupil in any of grades 4 to 12, inclusive, may be suspended from school or recommended for expulsion if the superintendent or the principal of the school in which the pupil is enrolled determines that the pupil has caused, attempted to cause, threatened to cause, or participated in an act of, hate violence, as defined in subdivision (e) of [former] Section 33032.5 [current section 233]."

In addition, Education Code, section 48900.4 (Stats. 1994, ch. 1017, § 1, p. 6196) provided, at the time relevant here: "In addition to the grounds specified in Sections 48900 and 48900.2, a pupil enrolled in any of grades 4 to 12, inclusive, may be suspended from school or recommended for expulsion if the superintendent or the principal of the school in which the pupil is enrolled determines that the pupil has intentionally engaged in harassment, threats, or intimidation, directed against a pupil or group of pupils, that is sufficiently severe or pervasive

## B. *Proceedings Under Government Code section 17500 et seq.*

Procedures governing the constitutional requirement of reimbursement under article XIII B, section 6, are set forth in Government Code section 17500 et seq. The Commission on State Mandates (Commission) (Gov. Code, § 17525) is charged with the responsibility of hearing and deciding, subject to judicial review by an administrative writ of mandate, claims for reimbursement made by local governments or school districts. (Gov. Code, § 17551.) Government Code section 17561, subdivision (a), provides that the "state shall reimburse each . . . school district for all 'costs mandated by the state,' as defined in section 17514." Government Code section 17514, in turn, defines "costs mandated by the state" to mean, in relevant part, "any increased costs which a . . . school district is required to incur . . . as a result of any statute . . . which mandates a new program or higher level of service of an existing program within the meaning of Section 6 of Article XIII B of the California Constitution." Finally, Government Code section 17556 sets forth circumstances in which there shall be no reimbursement, including, under subdivision (c), circumstances in which "[t]he statute or executive order implemented a federal law or regulation and resulted in costs mandated by the federal government, unless the statute or executive order mandates costs which exceed the mandate in that federal law or regulation."

In March 1994, the District filed a "test claim" with the Commission, asserting entitlement to reimbursement for the costs of hearings provided with respect to both categories of cases described above—that is, those hearings triggered by mandatory expulsion recommendations, and those hearings resulting from discretionary expulsion recommendations. (See Gov. Code, § 17521; *Kinlaw v. State of California* (1991) 54 Cal.3d 326, 331–333 [285 Cal.Rptr. 66, 814 P.2d 1308].)[10] The District sought reimbursement for costs incurred between July 1, 1993, and June 30, 1994, under statutes effective through the latter date.

In August 1998, after holding hearings on the District's claim (as amended in April 1995, to reflect legislation that became effective in 1994), the Commission issued a "Corrected Statement of Decision" in which it determined that Education Code section 48915's requirement of suspension and a

___

to have the actual and reasonably expected effect of materially disrupting classwork, creating substantial disorder, and invading the rights of that pupil or group of pupils by creating an intimidating or hostile educational environment."

(All of these current provisions—sections 48915, subdivision (e), 48900, 48900.2, 48900.3, and 48900.4—read today substantially the same as they did at the time relevant in the present case.)

[10] As observed by amicus curiae California School Boards Association, a "test claim is like a class action—the Commission's decision applies to all school districts in the state. If the district is successful, the Commission goes to the Legislature to fund the statewide costs of the mandate for that year and annually thereafter as long as the statute is in effect."

mandatory recommendation of expulsion for firearm possession constituted a "new program or higher level of service," and found that because costs related to some of the resulting hearing provisions set forth in Education Code section 48918 (primarily various notice, right of inspection, and recording provisions) exceeded the requirements of federal due process, those additional hearing costs constituted reimbursable state-mandated costs.[11] As to the vast majority of the remaining hearing procedures triggered by Education Code section 48915's requirement of suspension and a mandatory recommendation of expulsion for firearm possession—for example, procedures governing such matters as the hearing itself and the board's decision; a statement of facts and charges; notice of the right to representation by counsel; written findings; recording of the hearing; and the making of a record of the expulsion—the Commission found that those procedures were enacted to comply with federal due process requirements, and hence fell within the exception set forth in Government Code section 17556, subdivision (c), and did not impose a reimbursable state mandate. The Commission further found that with respect to Education Code section 48915's *discretionary* expulsions, there was no right to reimbursement for costs incurred in holding expulsion hearings, because such expulsions do not constitute a new program or higher level of service, and in any event such expulsions are not *mandated* by the state, but instead represent a choice by the principal and the school board.

In October 1999, the District brought this proceeding for an administrative writ of mandate challenging the Commission's decision. The trial court issued a writ commanding the Commission to render a new decision finding (i) all costs associated with hearings triggered by compulsory suspensions and mandatory expulsion recommendations are reimbursable, and (ii) hearing costs associated with discretionary expulsions are reimbursable to the limited

---

[11] The Commission concluded that the costs incurred in providing the following state-mandated procedures under Education Code section 48918 exceeded federal due process requirements, and were reimbursable: (i) adoption of rules and regulations pertaining to pupil expulsions (§ 48918, first par. & *passim*); (ii) inclusion in the notice of hearing of (a) a copy of the disciplinary rules of the District, (b) a notice of the parents' obligation to notify a new school district, upon enrollment, of the pupil's expulsion, and (c) a notice of the opportunity to inspect and obtain copies of all documents to be used at the hearing (§ 48918, subd. (b)); (iii) allowing, upon request, the pupil or parent to inspect and obtain copies of the documents to be used at the hearing (§ 48918, subd. (b)); (iv) sending of written notice concerning (a) any decision to expel or suspend the enforcement of an expulsion order during a period of probation, (b) the right to appeal the expulsion to the county board of education, and (c) the obligation of the parent to notify a new school district, upon enrollment, of the pupil's expulsion (§ 48918, former subd. (i), currently subd. (j)); (v) maintenance of a record of each expulsion, including the cause thereof (§ 48918, former subd. (j), currently subd. (k)); and (vi) the recording of expulsion orders and the causes thereof in the pupil's mandatory interim record (and, upon request, the forwarding of this record to any school in which the pupil subsequently enrolls) (§ 48918, former subd. (j), currently subd. (k)).

extent that required hearing procedures exceed federal due process mandates. The Commission (defendant) and the Department of Finance (real party in interest, hereafter Department) appealed, and the Court of Appeal affirmed the judgment rendered by the trial court.

## II

### A. Costs associated with hearings triggered by compulsory suspensions and mandatory expulsion recommendations

#### 1. "New program or higher level of service"?

We address first the issue that we asked the parties to brief: Does Education Code section 48915, former subdivision (b) (current subds. (c) & (d)), which mandated suspension and an expulsion recommendation for those students who possess a firearm at school or at a school activity off school grounds, and which also required a school board, if it found the charge proved, either to expel or to "refer" such a student to an alternative educational program housed at a separate school site, constitute a "new program or higher level of service" under article XIII B, section 6 of the state Constitution, and under Government Code section 17514?

We addressed the meaning of the Constitution's phrase "new program or higher level of service" in *County of Los Angeles v. State of California* (1987) 43 Cal.3d 46 [233 Cal.Rptr. 38, 729 P.2d 202] (*County of Los Angeles*). That case concerned whether local governments are entitled to reimbursement for costs incurred in complying with legislation that required local agencies to provide the same increased level of workers' compensation benefits for their employees as private individuals or organizations were required to provide for their employees. We stated:

"Looking at the language of [article XIII B, section 6] then, it seems clear that by itself the term 'higher level of service' is meaningless. It must be read in conjunction with the predecessor phrase 'new program' to give it meaning. Thus read, it is apparent that the subvention requirement for increased or higher level of service is directed to state mandated increases in the services provided by local agencies in existing 'programs.' But the term 'program' itself is not defined in article XIII B. What programs then did the electorate have in mind when section 6 was adopted? We conclude that the drafters and the electorate had in mind the commonly understood meanings of the term—[(1)] programs that carry out the governmental function of providing services to the public, or [(2)] laws which, to implement a state policy, impose unique requirements on local governments and do not apply generally to all residents and entities in the state." (*County of Los Angeles, supra,* 43 Cal.3d 46, 56.)

We continued in *County of Los Angeles*: "The concern which prompted the inclusion of section 6 in article XIII B was the perceived attempt by the state to enact legislation or adopt administrative orders creating programs to be administered by local agencies, thereby transferring to those agencies the fiscal responsibility for providing services which the state believed should be extended to the public. In their ballot arguments, the proponents of article XIII B explained section 6 to the voters: 'Additionally, this measure: (1) Will not allow the state government to *force programs* on local governments without the state paying for them.' (Ballot Pamp., Proposed Amend. to Cal. Const. with arguments to voters, Spec. Statewide Elec. (Nov. 6, 1979) p. 18. Italics added.) In this context the phrase 'to force programs on local governments' confirms that *the intent underlying section 6 was to require reimbursement to local agencies for the costs involved in carrying out functions peculiar to government, not for expenses incurred by local agencies as an incidental impact of laws that apply generally to all state residents and entities.*" (*County of Los Angeles, supra,* 43 Cal.3d 46, 56–57, italics added.)

It was clear in *County of Los Angeles, supra,* 43 Cal.3d 46, that the law at issue did not meet the second test for a "program or higher level of service"—it did not implement a state policy by imposing unique requirements upon local governments, but instead applied workers' compensation contribution rules generally to all employers in the state. Nor, we held, did the law requiring local agencies to shoulder a general increase in workers' compensation benefits amount to a reimbursable "program or higher level of service" under the first test described above. (*Id.,* at pp. 57–58.) The law increased the cost of employing public servants, but it did not in any tangible manner increase the level of service provided by those employees to the public.

We reaffirmed and applied the test set out in *County of Los Angeles, supra,* 43 Cal.3d 46, in *Lucia Mar Unified School District v. Honig* (1988) 44 Cal.3d 830 [244 Cal.Rptr. 677, 750 P.2d 318] (*Lucia Mar*). The state law at issue in *Lucia Mar* required local school districts to pay a portion of the cost of educating pupils in *state* schools for the severely handicapped—costs that the state previously had paid in full.

We determined that the contributions called for under the law were used to fund a "program" within both definitions of that term set forth in *County of Los Angeles.* (*Lucia Mar, supra,* 44 Cal.3d 830, 835.) We stated: "[T]he education of handicapped children is clearly a governmental function providing a service to the public, and the [state law] imposes requirements on school districts not imposed on all the state's residents. Nor can there be any doubt that although the schools for the handicapped have been operated by the state for many years, the program was new insofar as plaintiffs are

concerned, since at the time [the state law] became effective they were not required to contribute to the education of students from their districts at such schools. [¶] . . . To hold, under the circumstances of this case, that a shift in funding of an existing program from the state to a local entity is not a new program as to the local agency would, we think, violate the intent underlying section 6 of article XIII B. . . . Section 6 was intended to preclude the state from shifting to local agencies the financial responsibility for providing public services in view of . . . restrictions on the taxing and spending power of the local entities." (*Lucia Mar, supra,* 44 Cal.3d 830, 835–836; see also *County of San Diego v. State of California* (1997) 15 Cal.4th 68, 98 [61 Cal.Rptr.2d 134, 931 P.2d 312] [legislation excluding indigents from Medi-Cal coverage transferred obligation for such costs from state to counties, and constituted a reimbursable "new program or higher level of service"].)

We again applied the alternative tests set forth in *County of Los Angeles, supra,* 43 Cal.3d 46, in *City of Sacramento v. State of California* (1990) 50 Cal.3d 51 [266 Cal.Rptr. 139, 785 P.2d 522] (*City of Sacramento*). In that case we considered whether a state law implementing federal "incentives" that encouraged states to extend unemployment insurance coverage to all public employees constituted a program or higher level of service under article XIII B, section 6. We concluded that it did not because, as in *County of Los Angeles,* (1) providing unemployment compensation protection to a city's own employees was not a service to the public; and (2) the statute did not apply uniquely to local governments—indeed, the same requirements previously had been applied to most employers, and extension of the requirement (by eliminating a prior exemption for local governments) merely placed local government employers on the same footing as most private employers. (*City of Sacramento, supra,* 50 Cal.3d at pp. 67–68.)

Subsequently, the Court of Appeal in *City of Richmond v. Commission on State Mandates* (1998) 64 Cal.App.4th 1190 [75 Cal.Rptr.2d 754] (*City of Richmond*), following *County of Los Angeles, supra,* 43 Cal.3d 46, and *City of Sacramento, supra,* 50 Cal.3d 51, concluded that requiring local governments to provide death benefits to local safety officers, under both the Public Employees' Retirement System (PERS) and the workers' compensation system, did not constitute a higher level of service to the public. The Court of Appeal arrived at that determination even though—as might also have been argued in *County of Los Angeles* and *City of Sacramento*—such benefits may "generate a higher quality of local safety officers" and thereby, in a general and indirect sense, provide the public with a "higher level of service" by its employees. (*City of Richmond, supra,* 64 Cal.App.4th 1190, 1195.)

■ Viewed together, these cases (*County of Los Angeles, supra,* 43 Cal.3d 46, *City of Sacramento, supra,* 50 Cal.3d 51, and *City of Richmond,*

*supra,* 64 Cal.App.4th 1190) illustrate the circumstance that simply because a state law or order may *increase the costs* borne by local government *in providing services*, this does not necessarily establish that the law or order constitutes an *increased or higher level* of the resulting "service to the public" under article XIII B, section 6, and Government Code section 17514.[12]

■ By contrast, Courts of Appeal have found a reimbursable "higher level of service" concerning an existing "program" when a state law or executive order mandates not merely some change that increases the cost of providing services, but an increase in the actual level or quality of governmental services provided. In *Carmel Valley Fire Protection Dist. v. State of California* (1987) 190 Cal.App.3d 521, 537–538 [234 Cal.Rptr. 795] (*Carmel Valley*), for example, an executive order required that county firefighters be provided with protective clothing and safety equipment. Because this increased safety equipment apparently was designed to result in more effective fire protection, the mandate evidently was intended to produce a higher level of service to the public, thereby satisfying the first alternative test set out in *County of Los Angeles, supra,* 43 Cal.3d 46, 56. Similarly, in *Long Beach Unified School District v. State of California* (1990) 225 Cal.App.3d 155, 173 [275 Cal.Rptr. 449] (*Long Beach*), an executive order required school districts to take specific steps to measure and address racial segregation in local public schools. The appellate court held that this constituted a "higher level of service" to the extent the order's requirements exceeded federal constitutional and case law requirements by mandating school districts to undertake defined remedial actions and measures that were merely advisory under prior governing law.

The District and the Commission assert that the "mandatory" aspect of Education Code section 48915, insofar as it compels suspension and mandates an expulsion recommendation for firearm possession (and thereafter restricts the board's options to expulsion or referral to an off-site alternative school), carries out a governmental function of providing services to the public and hence constitutes an increased or higher level of service concerning an existing program under the first alternative test of *County of Los Angeles, supra,* 43 Cal.3d 46, 56. They argue, in essence, that the present matter is more analogous to the latter cases (*Carmel Valley, supra,* 190

---

[12] Indeed, as the court in *City of Richmond, supra,* 64 Cal.App.4th 1190, observed: "Increasing the cost of providing services cannot be equated with requiring an increased level of service under [article XIII B,] section 6 . . . . A higher cost to the local government for compensating its employees is not the same as a higher cost of providing [an increased level of] services to the public." (*Id.,* at p. 1196; accord, *City of Anaheim v. State of California* (1987) 189 Cal.App.3d 1478, 1484 [235 Cal.Rptr. 101] [temporary increase in PERS benefit to retired employees, resulting in higher contribution rate by local government, does not constitute a higher level of service to the public].)

Cal.App.3d 521, and *Long Beach, supra,* 225 Cal.App.3d 155)—both of which involved measures designed to increase the level of governmental service provided to the public—than to the former cases (*County of Los Angeles, supra,* 43 Cal.3d 46, *City of Sacramento, supra,* 50 Cal.3d 51, and *City of Richmond, supra,* 64 Cal.App.4th 1190)—in which the cost of employment was increased but the resulting governmental services themselves were not directly enhanced or increased. As we shall explain, we agree with the District and the Commission.

■ The statutory requirements here at issue—immediate suspension and mandatory recommendation of expulsion for students who possess a firearm, and the limitation upon the ensuing options of the school board (expulsion or referral)—reasonably are viewed as providing a "higher level of service" to the public under the commonly understood sense of that term: (i) the requirements are new in comparison with the preexisting scheme in view of the circumstance that they did not exist prior to the enactment of Statutes of 1993, chapters 1255 (Assem. Bill No. 342 (1993–1994 Reg. Sess.) (Assembly Bill No. 342)) and 1256 (Senate Bill No. 1198 (1993–1994 Reg. Sess.) (Senate Bill No. 1198)); and (ii) the requirements were intended to provide an enhanced service to the public—*safer schools for the vast majority of students* (that is, those who are not expelled or referred to other school sites). In other words, the legislation was premised upon the idea that by removing potentially violent students from the general school population, the safety of those students who remain thereby is increased. (See, e.g., Stats. 1993, ch. 1255, § 4, pp. 7285–7286 ["In order to ensure public safety on school campuses . . . it is necessary that this act take effect immediately"]; Sen. Com. on Education (Apr. 28, 1993), Analysis of Assem. Bill No. 342, p. 2 [noting legislative purpose to enhance public safety]; see also Assem. Com. on Education (July 14, 1993), Analysis of Sen. Bill No. 1198, p. 1 [noting legislative purpose to remove those who possess firearms from the general school population by increasing the frequency of expulsion for such conduct].)

In challenging this conclusion, the Department relies upon *County of Los Angeles v. Department of Industrial Relations* (1989) 214 Cal.App.3d 1538 [263 Cal.Rptr. 351] (*Department of Industrial Relations*). In that case, the state enacted enhanced statewide safety regulations that governed all public and private elevators, and thereafter the County of Los Angeles sought reimbursement for the costs of complying with the new regulations. The Court of Appeal found that the regulations constituted neither a new program nor a higher level of service concerning an existing program under either of the two alternative tests set out in *County of Los Angeles, supra,* 43 Cal.3d 46, 56. The court concluded that the elevator regulations did not meet the first alternative test, because the regulations did not carry out a governmental function of providing services to the public; the court found instead that

"[p]roviding elevators equipped with fire and earthquake safety features simply is not a 'government function of providing services to the public.' " (*Department of Industrial Relations, supra,* 214 Cal.App.3d at p. 1546.) Moreover, the court found, the second ("uniqueness") test was not met—the regulation applied to all elevators, not only those owned or operated by local governments.

 The Department asserts that *Department of Industrial Relations, supra,* 214 Cal.App.3d 1538, is analogous, and argues that the "service" afforded by mandatory suspensions followed by a required expulsion recommendation, etc., is "not qualitatively different from the safety regulations at issue in [*Department of Industrial Relations*]. School districts carrying out such expulsions are not providing a service to the public . . . ." We disagree. Providing public schooling clearly constitutes a governmental function, and enhancing the safety of those who attend such schools constitutes a service to the public. Moreover, here, unlike the situation in *Department of Industrial Relations,* the law implementing this state policy applies uniquely to local public schools. We conclude that *Department of Industrial Relations* does not conflict with the conclusion that the mandatory suspension and expulsion recommendation requirements, together with restrictions placed upon a district's resolution of such a case, constitute an increased or higher level of service to the public under the constitutional provision and the implementing statutes.

Of course, even if, as we have concluded above, a statute effectuates an increased or higher level of governmental service to the public concerning an existing program, this "does not necessarily lead to the conclusion that the program is a *state* mandate under California Constitution, article XIII B, section 6." (*County of Los Angeles v. Commission on State Mandates* (1995) 32 Cal.App.4th 805, 818 [38 Cal.Rptr.2d 304], italics added (*County of Los Angeles II*).) We turn to the question whether the hearing costs at issue, flowing from compulsory suspensions and mandatory expulsion recommendations, are mandated by the state.

2. *Are the hearing costs state mandated?*

As noted above, a compulsory suspension and a mandatory recommendation of expulsion under Education Code section 48915 in turn trigger a mandatory expulsion hearing. All parties agree that any such resulting expulsion hearing must comply with basic federal due process requirements, such as notice of charges, a right to representation by counsel, an explanation of the evidence supporting the charges, and an opportunity to call and cross-examine witnesses and to present evidence. (See *ante,* fn. 5.) But as also noted above, article XIII B, section 6, and the implementing statutes

(Gov. Code, § 17500 et seq.), by their terms, provide for reimbursement only of *state*-mandated costs, not *federally* mandated costs. The Commission and the Department assert that this circumstance raises the question: Do all or some of a district's costs in complying with the mandatory expulsion provision of Education Code section 48915 constitute a nonreimbursable *federal* mandate?

In the absence of the operation of Education Code section 48915's mandatory provision (specifically, compulsory immediate suspension and a mandatory expulsion recommendation), a school district would not automatically incur the due process hearing costs that are mandated by federal law pursuant to *Goss, supra,* 419 U.S. 565, and related cases, and codified in Education Code section 48918. Instead, a district would incur such hearing costs only if a school principal first were to exercise discretion to recommend expulsion. Accordingly, in its mandatory aspect, Education Code section 48915 appears to constitute a state mandate, in that it establishes conditions under which the state, rather than local officials, has made the decision requiring a school district to incur the costs of an expulsion hearing.

The Department and the Commission agree to a point, but argue that a district's costs incurred in complying with this state mandate are reimbursable only if, and to the extent that, hearing procedures set forth in Education Code section 48918 exceed the requirements of federal due process. In support, they rely upon Government Code section 17556, which—in setting forth circumstances in which the Commission shall *not* find costs to be mandated by the state—provides that "[t]he commission shall not find costs mandated by the state, as defined in Section 17514, in any claim submitted by a local agency or school district, if, after a hearing, the commission finds that: [¶] . . . [¶] (c) The statute or executive order implemented a federal law or regulation and resulted in costs mandated by the federal government, unless the statute or executive order mandates costs which exceed the mandate in that federal law or regulation."[13]

---

[13] Government Code section 17556 reads in full: "The commission shall not find costs mandated by the state, as defined in Section 17514, in any claim submitted by a local agency or school district, if, after a hearing, the commission finds that: [¶] (a) The claim is submitted by a local agency or school district which requested legislative authority for that local agency or school district to implement the program specified in the statute, and that statute imposes costs upon that local agency or school district requesting the legislative authority. A resolution from the governing body or a letter from a delegated representative of the governing body of a local agency or school district which requests authorization for that local agency or school district to implement a given program shall constitute a request within the meaning of this paragraph. [¶] (b) The statute or executive order affirmed for the state that which had been declared existing law or regulation by action of the courts. [¶] (c) The statute or executive order implemented a federal law or regulation and resulted in costs mandated by the federal government, unless the statute or executive order mandates costs which exceed the mandate in

■ We agree with the District and the Court of Appeal below that, as applied to the present case, it cannot be said that Education Code section 48915's mandatory expulsion provision "*implemented a federal law or regulation.*" (Italics added.) Education Code section 48915, at the time relevant here, did not implement any federal law; as explained below, federal law did not *then* mandate an expulsion recommendation—or expulsion—for firearm possession.[14] Moreover, although the Department argues that in this context Government Code section 17556, subdivision (c)'s phrase "the statute" should be viewed as referring not to Education Code section 48915's mandatory expulsion recommendation requirement, but instead to the mandatory due process hearing under Education Code section 48918 that is triggered by such an expulsion recommendation, it still cannot be said that section 48918 itself required the District to incur any costs. As noted above, Education Code section 48918 sets out requirements for expulsion hearings that must be held when a district seeks to expel a student—but neither section 48918 nor federal law requires that any such expulsion recommendation be made in the first place, and hence section 48918 does not implement any federal mandate that school districts hold such hearings and incur such costs whenever a student is found in possession of a firearm. Accordingly, we conclude that the so-called exception to reimbursement described in Government Code section 17556, subdivision (c), is inapplicable in this context.

■ Because it is state law (Education Code section 48915's mandatory expulsion provision), and not federal due process law, that requires the District to take steps that in turn require it to incur hearing costs, it follows, contrary to the view of the Commission and the Department, that we cannot characterize *any* of the hearing costs incurred by the District, triggered by the mandatory provision of Education Code section 48915, as constituting a federal mandate (and hence being nonreimbursable). We conclude that under the statutes existing at the time of the test claim in this case (state legislation in effect through mid-1994), *all* such hearing costs—those designed to satisfy the minimum requirements of federal due process, and those that may exceed

---

that federal law or regulation. [¶] (d) The local agency or school district has the authority to levy service charges, fees, or assessments sufficient to pay for the mandated program or increased level of service. [¶] (e) The statute or executive order provides for offsetting savings to local agencies or school districts which result in no net costs to the local agencies or school districts, or includes additional revenue that was specifically intended to fund the costs of the state mandate in an amount sufficient to fund the cost of the state mandate. [¶] (f) The statute or executive order imposed duties which were expressly included in a ballot measure approved by the voters in a statewide election. [¶] (g) The statute created a new crime or infraction, eliminated a crime or infraction, or changed the penalty for a crime or infraction, but only for that portion of the statute relating directly to the enforcement of the crime or infraction."

[14] Subsequent amendments to federal law may alter this conclusion with regard to future test claims concerning Education Code section 48915's mandatory expulsion provision—see *post*, pages 882–883.

those requirements—are, with respect to the mandatory expulsion provision of section 48915, state-mandated costs, fully reimbursable by the state.[15]

Against this conclusion, the Department, in its supplemental briefing, offers a wholly new theory, not advanced in any of the proceedings below, in support of its belated claim that *all* hearing costs triggered by Education Code section 48915's mandatory expulsion provision are in fact nonreimbursable *federal* mandates, and not, as we have concluded above, reimbursable state mandates. As we shall explain, we reject the Department's contention, as applied to the test case here at issue (involving state statutes in effect through mid-1994).

The Department cites 20 United States Code section 7151, part of the federal No Child Left Behind Act of 2001, which provides, as relevant here: "Each State receiving Federal funds under any [subchapter of this chapter] shall have in effect a State law requiring local educational agencies to expel from school for a period of not less than 1 year a student who is determined to have brought a firearm to a school, or to have possessed a firearm at a school, under the jurisdiction of local educational agencies in that State, except that such State law shall allow the chief administering officer of a local educational agency to modify such expulsion requirement for a student on a case-by-case basis if such modification is in writing."[16]

The Department further asserts that more than $2.8 billion in federal funds under the No Child Left Behind Act are included "for local use" in the 2003–2004 state budget. (Cal. State Budget, 2003–2004, Budget Highlights, p. 4.) The Department argues that in light of the requirements set forth in 20 United States Code section 7151, and the amount of federal program funds at issue under the No Child Left Behind Act, the financial consequences to the state and to the school districts of failing to comply with 20 United States Code section 7151 are such that as a practical matter, Education Code section

---

[15] In exhibit No. 1 to its claim, the District presented the declaration of a District official, estimating that in order to process "350 proposed expulsions" during the period spanning July 1, 1993, to June 30, 1994, the District would incur approximately $94,200 "in staffing and other costs"—yielding an average estimated cost of approximately $270 per hearing during the relevant period. It is unclear from the record how many of these 350 hearings would be triggered by Education Code section 48915's mandatory expulsion provision (and constitute state-mandated costs subject to reimbursement under article XIII B, section 6), and how many of these 350 hearings would be triggered by Education Code section 48915's discretionary provision (and, as explained *post*, in part II.B., constitute a nonreimbursable *federal* mandate).

We note that in the proceedings below, the Commission did not confine reimbursement only to those matters as to which the District on its own initiative would not have sought expulsion in the absence of the statutory requirement that it seek expulsion—and the Department has not raised that point in the trial court or on appeal.

[16] "Firearm," as defined in 18 United States Code section 921, includes guns and explosives.

48915's mandatory expulsion provision in reality constitutes an implementation of federal law, and hence resulting costs are nonreimbursable except to the extent they exceed the requirements of federal law. (See Gov. Code, § 17556, subd. (c); see also *Kern High School Dist., supra,* 30 Cal.4th 727, 749–751; *City of Sacramento, supra,* 50 Cal.3d 51, 70–76.) Moreover, the Department asserts, to the extent school districts are compelled by federal law, through Education Code section 48915's mandatory expulsion provision, to hold hearings pursuant to section 48918 in cases of firearm possession on school grounds, under 20 United States Code section 7164 (defining prohibited uses of program funds), *all* costs of such hearings properly may be paid out of federal program funds, and hence we should "view the . . . provision of program funding as satisfying, in advance, any reimbursement requirement." (*Kern High School Dist., supra,* 30 Cal.4th 727, 747.)

Although the Department asserts that this federal law and program existed at the time relevant in this matter (that is, through mid-1994), our review of the statutes and relevant history suggests otherwise. Title 20 of the United States Code, section 7151, and the remainder of the No Child Left Behind Act, became effective on January 8, 2002. The predecessor legislation cited by the Department—the Gun-Free Schools Act of 1994 (former 20 U.S.C. § 8921(a)), although containing a substantially identical mandatory expulsion provision (*id.,* § 8921(b)(1))[17]—was not effective until July 1, 1995 (108 Stat. 3518, § 3). In turn, the predecessor legislation to *that* act cited by the Department, the Elementary and Secondary Education Act of 1965 (former 20 U.S.C. § 6301 et seq.) as it existed at the time relevant here (July 1, 1993, through June 30, 1994)—contained no such mandatory expulsion provision. Accordingly, it appears that despite the Department's late discovery of 20 United States Code section 7151, at the time relevant here (regarding legislation in effect through mid-1994), neither 20 United States Code section 7151, nor either of its predecessors, compelled states to enact a law such as Education Code section 48915's mandatory expulsion provision. Therefore, we reject the Department's assertion that, during the time period at issue in this case, Education Code section 48915's mandatory expulsion provision constituted an implementation of a federal, rather than a state, mandate.

██ Although we conclude that all hearing costs triggered by Education Code section 48915's mandatory expulsion provision constitute reimbursable state-mandated expenses under the statutes as they existed during the period

---

[17] The prior law stated: "Except as provided in paragraph (3), each State receiving Federal funds under this chapter shall have in effect a State law requiring local educational agencies to expel from school for a period of not less than one year a student who is determined to have brought a weapon to a school under the jurisdiction of local educational agencies in that State, except that such State law shall allow the chief administering officer of such local educational agency to modify such expulsion requirement for a student on a case-by-case basis." (Pub.L. No. 103-382, § 14601(b)(1) (Oct. 20, 1994) 108 Stat. 3518.)

covered by the District's present test claim, we do not foreclose the possibility that 20 United States Code section 7151 or its predecessor, 20 United States Code section 8921, may lead to a different conclusion when applied to versions of Education Code section 48915 effective in years 1995 and thereafter. Indeed, we note that at least one subsequent test claim that has been filed with the Commission may raise the federal statutory issue advanced by the Department.[18]

### B. Costs associated with hearings triggered by discretionary expulsion recommendations

We next consider whether reimbursement is required for the costs associated with hearings triggered under discretionary expulsion provisions. Again, we address first the issue that we asked the parties to brief: Does the discretionary expulsion provision of Education Code section 48915 (former subd. (c), thereafter subd. (d), currently subd. (e)), which, as noted above, recognized that a principal possesses *discretion* to recommend that a student be expelled for specified conduct other than firearm possession (conduct such as damaging or stealing property, using or selling illicit drugs, possessing tobacco or drug paraphernalia, etc.), and further specified that the school district governing board "may" order a student expelled upon finding that the student, while at school or at a school activity off school grounds, engaged in such conduct, constitute a "new program or higher level of service" under article XIII B, section 6 of the state Constitution, and under Government Code section 17514?

 We answer this question in the negative. The discretionary expulsion provision of Education Code section 48915 does not constitute a "new" program or higher level of service, because provisions recognizing discretion to suspend or expel were set forth in statutes predating 1975. (See Educ. Code, former § 10601, Stats. 1959, ch. 2, § 3, p. 860 [providing that a student may be suspended for good cause]; *id.*, former § 10602, Stats. 1970, ch. 102, § 102, p. 159 [defining "good cause"]; *id.*, former section 10601.6, Stats. 1972, ch. 164, § 2, p. 384 [further defining "good cause"].)[19] Accordingly, the discretionary expulsion provision of Education Code section 48915 is not a "new" program under article XIII B, section 6, and the implementing statutes,

---

[18] See Pupil Expulsions II (4th Amendment), CSM No. 01-TC-18 (filed June 3, 2002). This claim, filed by the San Juan Unified School District, asserts reimbursable state mandates with respect to, among numerous other statutes, Education Code section 48915, as amended effective in 2002.

[19] As the Commission observed in its Corrected Statement of Decision in this matter: "The authorization for governing boards to expel pupils from school for inappropriate behaviors has been in existence since before 1975. The behaviors defined as inappropriate under current law, subdivisions (a) though (l) of section 48900, 48900.2, and 48900.3, meet prior laws' definitions of 'good cause' and 'misconduct' as reasons for expulsion." (Italics deleted.)

nor does it reflect a higher level of service related to an existing program. (*County of Los Angeles, supra,* 43 Cal.3d 46, 56.)

The District maintains, nevertheless, that once it elects to pursue expulsion, it is obligated to abide by the procedural hearing requirements of Education Code section 48918 and accordingly is mandated by that section to incur costs associated with such compliance. The District asserts that in this respect, *section 48918* constitutes a "new program or higher level of service" related to an existing program under article XIII B, section 6 and under Government Code section 17514. We shall assume for analysis that this is so.[20]

The District recognizes, of course, that under Government Code, section 17556, subdivision (c), it is not entitled to reimbursement to the extent Education Code section 48918 merely implements federal due process law, but the District argues that it has a right to reimbursement for its costs of complying with section 48918 *to the extent* those costs are attributable to hearing procedures that *exceed* federal due process requirements. (See Gov. Code, § 17556, subd. (c).) The District asserts that its costs in complying with various notice, right of inspection, and recording requirements (see *ante,* fn. 11) fall into this category and are reimbursable.

The Department and the Commission argue in response that any right to reimbursement for hearing costs triggered by discretionary expulsions—even costs limited to those procedures that assertedly exceed federal due process hearing requirements—is foreclosed by virtue of the circumstance that when a school pursues a discretionary expulsion, it is not acting under compulsion of any law but instead is exercising a choice. In support, the Department and the Commission rely upon *Kern High School Dist., supra,* 30 Cal.4th 727, and *City of Merced v. State of California* (1984) 153 Cal.App.3d 777 [200 Cal.Rptr. 642] (*City of Merced*).

In *Kern High School Dist., supra,* 30 Cal.4th 727, school districts asserted that costs incurred in complying with statutory notice and agenda requirements for committee meetings concerning various state and federally funded educational programs constituted a reimbursable state mandate, because once

---

[20] The requirements of Education Code section 48918 would appear to be "new" for purposes of the reimbursement provisions, in that they did not exist prior to 1975 and were enacted in that year and subsequently. (See *ante,* fn. 2.) The requirements also would appear to meet both alternative tests set forth in *County of Los Angeles, supra,* 43 Cal.3d 46, 56—that is, by implementing procedures that direct and guide the process of expulsion from public school, the statute appears to carry out a governmental function of providing services to public school students who face expulsion; or, it would seem, section 48918 constitutes a law that, to implement state policy, imposes unique requirements on local governments.

school districts *elected* to participate in the underlying state and federal programs, the districts had no option but to hold program-related committee meetings and abide by the challenged notice and agenda requirements. (*Id.,* at p. 742.) We rejected the school districts' position, reasoning in part that because the districts' participation in the underlying programs was voluntary, the notice and agenda costs incurred as a result of that voluntary participation were not the product of legal compulsion and did not constitute a reimbursable state mandate on that basis. (*Id.,* at p. 745.)[21]

In reaching that conclusion in *Kern High School Dist., supra,* 30 Cal.4th 727, we discussed *City of Merced, supra,* 153 Cal.App.3d 777. In that case, the city wished either to purchase or to condemn, pursuant to its eminent domain authority, certain privately owned real property. The city elected to proceed by eminent domain, under which it was required by then recent legislation (Code Civ. Proc., § 1263.510) to compensate the property owner for loss of "business goodwill." The city so compensated the property owner and then sought reimbursement from the state, arguing that the new statutory requirement that it compensate for business goodwill amounted to a reimbursable state mandate. (*City of Merced, supra,* 153 Cal.App.3d at p. 780.) The Court of Appeal concluded that the city's increased costs flowing from its election to condemn the property did not constitute a reimbursable state mandate. (*Id.,* at pp. 781–783.) The court reasoned: "[W]hether a city or county decides to exercise eminent domain is, essentially, an option of the city or county, rather than a mandate of the state. *The fundamental concept is that the city or county is not required to exercise eminent domain. If, however, the power of eminent domain is exercised, then the city will be required to pay for loss of goodwill. Thus, payment for loss of goodwill is not a state-mandated cost.*" (*Id.,* at p. 783, italics added.)

Summarizing this aspect of *City of Merced, supra,* 153 Cal.App.3d 777, in *Kern High School Dist., supra,* 30 Cal.4th 727, we stated: "[T]he core point articulated by the court in *City of Merced* is that *activities undertaken at the option or discretion of a local government entity* (that is, actions undertaken without any legal compulsion or threat of penalty for nonparticipation) *do not trigger a state mandate and hence do not require reimbursement of funds— even if the local entity is obliged to incur costs as a result of its discretionary decision to participate in a particular program or practice.*" (*Kern High School Dist.,* at p. 742, italics added.)

The Department and the Commission argue that in the present case the District, like the claimants in *Kern High School Dist.,* errs by focusing upon

---

[21] We also proceeded to hold that in any event, because the school districts were free to use program funds to pay for the challenged increased costs, the districts had, in practical effect, already been given funds by the Legislature to cover the challenged costs. (*Kern High School Dist., supra,* 30 Cal.4th at pp. 748–754.)

the final result—a school district's legal obligation to comply with statutory hearing procedures—rather than focusing upon whether the school district has been *compelled* to put itself in the position in which such a hearing (with resulting costs) is required.

The District and amici curiae on its behalf (consistently with the opinion of the Court of Appeal below) argue that the holding of *City of Merced, supra,* 153 Cal.App.3d 777, should not be extended to apply to situations beyond the context presented in that case and in *Kern High School Dist., supra,* 30 Cal.4th 727. The District and amici curiae note that although any particular expulsion recommendation may be discretionary, as a practical matter it is inevitable that some school expulsions will occur in the administration of any public school program.[22]

Upon reflection, we agree with the District and amici curiae that there is reason to question an extension of the holding of *City of Merced* so as to preclude reimbursement under article XIII B, section 6 of the state Constitution and Government Code section 17514, whenever an entity makes an initial discretionary decision that in turn triggers mandated costs. Indeed, it would appear that under a strict application of the language in *City of Merced,* public entities would be denied reimbursement for state-mandated costs in apparent contravention of the intent underlying article XIII B, section

---

[22] Indeed, the Court of Appeal below suggested that the present case is distinguishable from *City of Merced, supra,* 153 Cal.App.3d 777, in light of article I, section 28, subdivision (c), of the state Constitution. That constitutional subdivision, part of Proposition 8 (known as the Victims' Bill of Rights initiative, adopted by the voters at the Primary Election in June 1982), states: "All students and staff of public primary, elementary, junior high and senior high schools have the inalienable right to attend campuses which are safe, secure and peaceful." The Court of Appeal below concluded: "In light of a school district's constitutional obligation to provide a safe educational environment . . . , the incurring of [hearing] costs [under Education Code section 48918] cannot properly be viewed as a nonreimbursable 'downstream' consequence of a decision to [seek to] expel a student under [Education Code section 48915's discretionary provision] for damaging or stealing school or private property, using or selling illicit drugs, receiving stolen property, engaging in sexual harassment or hate violence, or committing other specified acts of misconduct . . . that warrant such expulsion."

Building upon this theme, amicus curiae on behalf of the District, California School Boards Association, argues that based upon article I, section 28, subdivision (c), of the state Constitution, together with Education Code section 48200 et seq. and article IX, section 5 of the state Constitution (establishing and implementing a right of public education), *no* expulsion recommendation is "truly discretionary." Indeed, amicus curiae argues, school districts may not, "either as a matter of law or policy, realistically choose to [forgo] expelling [a] student [who commits one of the acts, other than firearm possession, referenced in Education Code section 48915's discretionary provision], because doing so would fail to meet that school district's legal obligations to provide a safe, secure and peaceful learning environment for the other students."

6 of the state Constitution and Government Code section 17514[23] and contrary to past decisions in which it has been established that reimbursement was in fact proper. For example, as explained above, in *Carmel Valley, supra,* 190 Cal.App.3d 521, an executive order requiring that county firefighters be provided with protective clothing and safety equipment was found to create a reimbursable state mandate for the added costs of such clothing and equipment. (*Id.,* at pp. 537–538.) The court in *Carmel Valley* apparently did not contemplate that reimbursement would be foreclosed in that setting merely because a local agency possessed discretion concerning how many firefighters it would employ—and hence, in that sense, could control or perhaps even avoid the extra costs to which it would be subjected. Yet, under a strict application of the rule gleaned from *City of Merced, supra,* 153 Cal.App.3d 777, such costs would not be reimbursable for the simple reason that the local agency's decision to employ firefighters involves an exercise of discretion concerning, for example, how many firefighters are needed to be employed, etc. We find it doubtful that the voters who enacted article XIII B, section 6, or the Legislature that adopted Government Code section 17514, intended that result, and hence we are reluctant to endorse, in this case, an application of the rule of *City of Merced* that might lead to such a result.

■ In any event, we have determined that we need not address in this case the problems posed by such an application of the rule articulated in *City of Merced,* because this aspect of the present case can be resolved on an alternative basis. As we shall explain, we conclude, regarding the reimbursement claim that we face presently, that *all* hearing procedures set forth in Education Code section 48918 properly should be considered to have been adopted to implement a federal due process mandate, and hence that all such hearing costs are nonreimbursable under article XIII B, section 6, and Government Code section 17557, subdivision (c).

In this regard, we find the decision in *County of Los Angeles II, supra,* 32 Cal.App.4th 805, to be instructive. That case concerned Penal Code section 987.9, which requires counties to provide indigent criminal defendants with defense funds for ancillary investigation services related to capital trials and certain other trials, and further provides related procedural protections— namely, the confidentiality of a request for funds, the right to have the request ruled upon by a judge other than the trial judge, and the right to an in camera hearing on the request. The county in that case asserted that funds expended under the statute constituted reimbursable state mandates. The Court of Appeal disagreed, finding instead that the Penal Code section merely implements the requirements of federal constitutional law, and that "even in the

---

[23] As we observed in *Kern High School Dist., supra,* 30 Cal.4th 727, 751–752, "article XIII B, section 6's 'purpose is to preclude the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are "ill equipped" to assume increased financial responsibilities.' "

absence of [Penal Code] section 987.9, . . . counties would be responsible for providing ancillary services under the constitutional guarantees of due process . . . and [under] the Sixth Amendment . . . ." (32 Cal.App.4th at p. 815.) Moreover, the Court of Appeal concluded, the procedural protections that the Legislature had built into the statute—requirements of confidentiality of a request for funds, the right to have the request ruled upon by a judge other than the trial judge, and the right to an in camera hearing on the request— were merely incidental to the federal rights codified by the statute, and their "financial impact" was de minimis. (*Id.*, at p. 817, fn. 7.) Accordingly, the Court of Appeal concluded, the Penal Code section, in its entirety—that is, *even those incidental aspects of the statute that articulated specific procedures, not expressly set forth in federal law, for the filing and resolution of requests for funds*—constituted an implementation of federal law, and hence those costs were nonreimbursable under article XIII B, section 6.

We conclude that the same reasoning applies in the present setting, concerning the District's request for reimbursement for procedural hearing costs triggered by its discretionary decision to seek expulsion. As in *County of Los Angeles II, supra,* 32 Cal.App.4th 805, the initial discretionary decision (in the former case, to file charges and prosecute a crime; in the present case, to seek expulsion) in turn triggers a federal constitutional mandate (in the former case, to provide ancillary defense services; in the present case, to provide an expulsion hearing). In both circumstances, the Legislature, in adopting specific statutory procedures to comply with the general federal mandate, reasonably articulated various incidental procedural protections. These protections are designed to make the underlying federal right enforceable and to set forth procedural details that were not expressly articulated in the case law establishing the respective rights; viewed singly or cumulatively, they did not significantly increase the cost of compliance with the federal mandate. The Court of Appeal in *County of Los Angeles II* concluded that, for purposes of ruling upon a claim for reimbursement, such incidental procedural requirements, producing at most de minimis added cost, should be viewed as part and parcel of the underlying federal mandate, and hence nonreimbursable under Government Code, section 17556, subdivision (c). We reach the same conclusion here.

Indeed, to proceed otherwise in the context of a reimbursement claim would produce impractical and detrimental consequences. The present case demonstrates the point. The record reveals that in the extended proceedings before the Commission, the parties spent numerous hours producing voluminous pages of analysis directed toward determining whether various provisions of Education Code section 48918 exceeded federal due process requirements. That task below was complicated by the circumstance that this area of federal due process law is not well developed. The Commission, which is not a judicial body, did as best it could and concluded that in certain

respects the various provisions (as observed *ante*, footnote 11, predominantly concerning notice, right of inspection, and recording requirements) "exceeded" the requirements of federal due process.

Even for an appellate court, it would be difficult and problematic in this setting to categorize the various notice, right of inspection, and recording requirements here at issue as falling either within or without the general federal due process mandate. The difficulty results not only from the circumstance that, as noted, the case law in the area of due process procedures concerning expulsion matters is relatively undeveloped, but also from the circumstance that when such an issue is raised in an action for reimbursement, as opposed to its being raised in litigation challenging an actual expulsion on the ground of allegedly inadequate hearing procedures, the issue inevitably is presented in the abstract, without any factual context that might help frame the legal issue. In such circumstances, courts are—and should be—wary of venturing pronouncements (especially concerning matters of constitutional law).

In light of these considerations, we agree with the conclusion reached by the Court of Appeal in *County of Los Angeles II, supra,* 32 Cal.App.4th 805: for purposes of ruling upon a request for reimbursement, challenged state rules or procedures that are intended to implement an applicable federal law—and whose costs are, in context, de minimis—should be treated as part and parcel of the underlying federal mandate.

Applying that approach to the case now before us, we conclude there can be no doubt that the assertedly "excessive due process" aspects of Education Code section 48918 for which the District seeks reimbursement in connection with hearings triggered by discretionary expulsions (see *ante*, footnote 11—primarily, as noted, various notice, right of inspection, and recording rules) fall within the category of matters that are merely incidental to the underlying federal mandate, and that produce at most a de minimis cost. Accordingly, for purposes of the District's reimbursement claim, all hearing costs incurred under Education Code section 48918, triggered by the District's exercise of discretion to seek expulsion, should be treated as having been incurred pursuant to a mandate of federal law, and hence all such costs are nonreimbursable under Government Code section 17556, subdivision (c).[24]

---

[24] We do not foreclose the possibility that a local government might, under appropriate facts, demonstrate that a state law, though codifying federal requirements in part, also imposes more than "incidental" or "de minimis" expenses in excess of those demanded by federal law, and thus gives rise to a reimbursable state mandate to that extent.

## III

The judgment of the Court of Appeal is affirmed insofar as it provides for full reimbursement of all costs related to hearings triggered by the mandatory expulsion provision of Education Code section 48915. The judgment of the Court of Appeal is reversed insofar as it provides for reimbursement of any costs related to hearings triggered by the discretionary provision of section 48915. All parties shall bear their own costs on appeal.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.