Filed 12/28/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SAN DIEGO et al., | D068657 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. 37-2014-0005050-CU-WM-CTL) |
| COMMISSION ON STATE MANDATES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Richard E.L. Strauss, Judge. Reversed.

Thomas E. Montgomery, County Counsel (San Diego), Timothy M. Barry, Chief Deputy County Counsel, Mary C. Wickham, County Counsel (Los Angeles), Sangkee Peter Lee, Deputy County Counsel, Leon J. Page, County Counsel (Orange), Suzanne E. Shoai, Deputy County Counsel, Robyn Truitt Drivon, County Counsel (Sacramento), Krista Castlebary Whitman, Assistant County Counsel, and Jean-Rene Claude Basle, County Counsel (San Bernardino), for Plaintiffs and Appellants.

Jennifer B. Henning for California State Association of Counties and League of California Cities as Amici Curiae on behalf of Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Mark R. Beckington and Kim L. Nguyen, Deputy Attorneys General, for Defendants and Respondents California Department of Finance, California State Controller, and the State of California.

Camille Shelton, Chief Legal Counsel, and Matthew B. Jones, Commission Counsel, for Defendant and Respondent Commission on State Mandates.

In 1998 the Commission on State Mandates (Commission), established by the Legislature to determine when the state is constitutionally required to reimburse local governments and school districts for state-mandated costs, concluded costs associated with eight activities required of local governments by the then-newly passed Sexually Violent Predator Act (SVPA, Welf. & Inst. Code, § 6600 et seq.) were eligible for reimbursement. Fifteen years later, at the request of the Department of Finance (DOF), the Commission revisited that decision based on the passage of Proposition 83 in 2006. The Commission concluded that six of the duties it deemed state-mandated in 1998 were instead mandated by the ballot initiative and, therefore, the costs of those activities to local governments were no longer eligible for reimbursement. The Counties of San Diego, Los Angeles, Orange, Sacramento and San Bernardino (Counties) challenged the Commission's decision by filing a petition for writ of administrative mandamus in San Diego County Superior Court.

The Counties now appeal the trial court's judgment upholding the Commission's decision. Our review of the relevant constitutional and statutory provisions lead us to reach the opposite conclusion. For the reasons set forth below, we reverse the trial court's

2

decision and direct the court to modify its judgment to issue a writ of mandate directing the Commission to set aside the decisions challenged in this action and reconsider the DOF's request in a manner consistent with this opinion.

BACKGROUND

A. Constitutional Subvention Requirement and Implementing Legislation

When the Legislature mandates a new program or higher level of service on a local government, the state is constitutionally required to reimburse the locality for the costs of the mandate. (Cal. Const., art. XIII B, § 6, subd. (a).) This requirement was the result of the passage of two related ballot initiatives, Proposition 13 in 1978 and Proposition 4 in 1979. Proposition 13 added article XIII A to the Constitution, which was "aimed at controlling ad valorem property taxes and the imposition of new 'special taxes' " on the citizens of California. (*County of Fresno v. State of California* (1991) 53 Cal.3d 482, 486 (*County of Fresno*).) Proposition 4 added article XIII B, placing "limitations on the ability of both state and local governments to appropriate funds for expenditures." (*County of Fresno,* at p. 486.) " 'Articles XIII A and XIII B work in tandem, together restricting California governments' power both to levy and to spend [taxes] for public purposes.' (*City of Sacramento* [*v. State of California* (1990)] 50 Cal.3d [51,] 59, fn. 1.)" (*Ibid.*) The initiatives' goals "were to protect residents from excessive taxation and government spending." (*County of Los Angeles v. State of California* (1987) 43 Cal.3d 46, 61 (*County of Los Angeles*).)

Section 6 of article XIII B "had the additional purpose of precluding a shift of financial responsibility for carrying out governmental functions from the state to local

3

agencies which had had their taxing powers restricted by the enactment of article XIII A in the preceding year and were ill equipped to take responsibility for any new programs." (*County of Los Angeles, supra,* 43 Cal.3d at p. 61; *Department of Finance v. Commission on State Mandates* (2016) 1 Cal.4th 5th 749, 758-759 (*Department of Finance*).) Section 6 "was designed to protect the tax revenues of local governments from state mandates that would require expenditure of such revenues." (*County of Fresno, supra,* 53 Cal.3d at p. 487.) The provision states "[w]henever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse that local government for the costs of the program or increased level of service . . . ." (Cal. Const., art. XII B, § 6, subd. (a).)

"In 1984, the Legislature enacted a comprehensive statutory and administrative scheme for implementing article XIII B, section 6. ([Gov. Code,[1]] § 17500 et seq.; [citations].) In so doing, the Legislature created the Commission . . . to resolve questions as to whether a statute imposes 'state-mandated costs on a local agency within the meaning of section 6.' " (*California School Bds. Assn. v. State of California* (2011) 192 Cal.App.4th 770, 780.) The legislation directs "the Commission not to find local government costs reimbursable if, among other things, '[t]he statute or executive order imposed duties which were expressly included in a ballot measure approved by the voters in a statewide election' (ballot measure mandates)." (*California School Boards Assn. v. State of California* (2009) 171 Cal.App.4th 1183, 1191 (*California School Boards*).)

---

1       All statutory references are to the Government Code unless otherwise specified.

4

Under this regulatory scheme, when the Legislature enacts a statute imposing obligations on a local agency or a school district without providing additional funding, the local entity may file a test claim with the Commission. (§§ 17551, 17555.) After a public hearing, the Commission must then determine whether the statute requires a new program or increased level of service.[2] (§§ 17551, 17555.) "If the Commission determines the statute meets this criterion, [it] must determine the cost of the mandated program or service and then notify specified legislative entities and executive officers of this decision. (§§ 17557, 17555.)" *California School Bds. Assn. v. State of California, supra,* 192 Cal.App.4th at p. 781.)

Multiple claimants may join together to pursue a test claim, and the Commission's decision applies statewide to all similarly situated local agencies or school districts. (Cal. Code Regs., tit. 2, § 1183.1.) A test claim is the "exclusive procedure" for claiming and obtaining reimbursement for costs mandated by the state. (§ 17552.) "A local agency or school district may challenge the Commission's findings by administrative mandate proceedings. (§ 17559; Code Civ. Proc., § 1094.5.)" (*California School Bds. Assn. v. State of California, supra,* 192 Cal.App.4th at p. 781.)

The statutory scheme implementing article XIII B, section 6 also provided "that if the Legislature identifies a particular mandate in the Budget Act as one for which

---

2    The Commission is a quasi-judicial body and is composed of seven members: The controller; the treasurer; the director of the Department of Finance; the director of the Office of Planning and Research; a member of the public with experience in public finance; and two members appointed by the Governor who serve as city council members, members of a county or city and county board of supervisors, or governing board members of a school district. (Gov. Code, §§ 17525, 17551.)

reimbursement is not provided for that fiscal year, the local agencies are not required to comply with the mandate during that year.  [¶]  For a number of years, the Legislature chose not to fund certain mandates, but did not identify the mandates in the Budget Act as those for which no reimbursement would be provided.  Instead, the Legislature funded the mandates in the token amount of $1,000.  This had the effect of *not* automatically suspending the operation of the mandates, but leaving them virtually unfunded.  [Footnote omitted.]  Local agencies advanced considerable funds complying with drastically underfunded mandates, with the expectation of ultimately obtaining reimbursement from the state."  (*California School Bds. Assn. v. Brown* (2011) 192 Cal.App.4th 1507, 1512-1513.)

This issue led to the passage of Proposition 1A in November 2004, which, "among other things [added] section 6, subdivision (b) to article XIII B.  That subdivision provides that, for every fiscal year, 'for a mandate for which the costs of a local government claimant have been determined in a preceding fiscal year to be payable by the State pursuant to law, the Legislature shall either appropriate, in the annual Budget Act, the full payable amount that has not been previously paid, or suspend the operation of the mandate for the fiscal year for which the annual Budget Act is applicable in a manner prescribed by law.'  (Cal. Const., art. XIII B, § 6, subd. (b)(1).) . . .  Thus, with respect to a reimbursable mandate, for each fiscal year, the Legislature is required to choose to either fully fund the annual payment toward the arrearage or suspend the operation of the mandate."  (*California School Bds. Assn. v. Brown, supra*, 192 Cal.App.4th at pp. 1513-1514.)

6

B.  Sexually Violent Predators Act and Initial Test Claim

The SVPA, enacted in 1995, established commitment procedures for the civil detention and treatment of sexually violent predators (SVPs) after the completion of criminal sentences for certain sex-related offenses.  (Welf. & Inst. Code, §§ 6600-6608.) The law outlines the qualifications for commitment under the SVPA and specifies the due process protections afforded to the identified offender.  If an offender meets the criteria, he or she must undergo an evaluation by the State Department of State Hospitals.[3] (Welf. & Inst. Code, §6600, subd. (a)(3).)  Before civil detention and treatment are imposed, the law requires county counsel or a district attorney to file a petition for civil commitment in superior court.  (Welf. & Inst. Code, § 6601.)  A probable cause hearing (Welf. & Inst. Code, § 6602), followed by a jury trial, is then conducted to determine beyond a reasonable doubt if the person is an SVP.  (Welf. & Inst. Code, §§ 6602-6603.) If the person alleged to be an SVP is indigent, the county must provide him or her with the assistance of counsel and experts necessary to prepare a defense to the commitment petition at both the probable cause hearing and trial.  (*Ibid*.)

After the SVPA was enacted, the County of Los Angeles brought a test claim seeking reimbursement of the costs incurred by local governments in complying with the duties imposed by the SVPA.  On June 25, 1998, the Commission adopted a statement of

---

3    At the time the SVPA was enacted this responsibility was administered by the Department of Mental Health (DMH).  In 2012 the Legislature established the State Department of State Hospitals and moved responsibility for the evaluation, care, treatment and education of SVPs from the DMH to the new State Department of State Hospitals.  (Legis. Counsel's Dig., Assem. Bill No. 1470 (2011-2012 Reg. Sess.).)

decision approving reimbursement for those costs. In its decision, the Commission "concluded that the test claim legislation[, identified by the claimants as Welfare and Institutions Code sections 6250 and 6600 through 6608,] impose[d] a new program or higher level of service upon local agencies within the meaning of article XIII B, section 6, of the California Constitution."

The statement of decision specified eight activities the Commission approved for reimbursement and identified the specific Welfare and Institutions Code provisions from which it determined each activity arose: "[(1)] Designation by the County Board of Supervisors of the appropriate District Attorney or County Counsel who will be responsible for the sexually violent predator civil commitment proceedings. (Welf. & Inst. Code, § 6601, subd. (i) .) [¶] [(2)] Initial review of reports and records by the county's designated counsel to determine if the county concurs with the state's recommendation. (Welf. & Inst. Code, § 6601, subd. (i).) [¶] [(3)] Preparation and filing of the petition for commitment by the county's designated counsel. (Welf. & Inst. Code, § 6601, subd. ([i])[4].) [¶] [(4)] Preparation and attendance by the county's designated counsel and indigent defense counsel at the probable cause hearing. (Welf. & Inst. Code, § 6602.) [¶] [(5)] Preparation and attendance by the county's designated counsel and indigent defense counsel at trial. (Welf. & Inst. Code, §§ 6603 [&] 6604.) [¶] [(6)] Preparation and attendance by the county's designated counsel and indigent defense

---

4    The statement of decision identified subdivision (j), but all parties agree the reference was a typographical error and the decision intended to refer to subdivision (i) of Welfare and Institutions Code section 6601.

8

counsel at subsequent hearings regarding the condition of the sexually violent predator. (Welf. & Inst. Code, §§ 6605, subds. (b)[-](d) [&] 6608, subds. (a)[-](d).) [¶] [(7)] Retention of necessary experts, investigators, and professionals for preparation for trial and subsequent hearings regarding the condition of the sexually violent predator.  (Welf. & Inst. Code, §§ 6603 [&] 6605, subd. (d).) [¶] [(8)] Transportation and housing for each potential sexually violent predator at a secured facility while the individual awaits trial on the issue of whether he or she is a sexually violent predator.  (Welf. & Inst. Code, § 6602.)"[5]

The decision denied the test claim with respect to the remaining Welfare and Institutions Code provisions that make up the SVPA, concluding those provisions "do not impose reimbursable state mandated activities upon local agencies."

C.  Subsequent Changes to the SVPA and Proposition 83

On June 30, 2006, the Secretary of State announced that Proposition 83, also known as Jessica's Law, qualified for the ballot for the November 7, 2006 general election.  The intent of the initiative, as set forth in section 2, subdivision (h) of the measure, was to "take additional steps to monitor sex offenders, to protect the public from them, and to provide adequate penalties for and safeguards against sex offenders, particularly those who prey on children."  (Prop. 83, as approved by voters, Gen. Elec.

_____

[5]    In their opening brief, the Counties state that since the adoption of the test claim decision counties have submitted claims and been reimbursed in excess of $186 million for performing these activities.  The state provided $20,754,301 from its general fund in fiscal year 2012-2013 for SVPA reimbursements and the Governor's Budget estimated $21,792,000 for the 2013-2014 fiscal year.

(Nov. 7, 2006).) The focus of the initiative was to amend provisions of the Penal Code to "[i]ncrease[] penalties for violent and habitual sex offenders and child molesters" and to prevent such offenders from residing within close proximity of schools and parks. (*Id.*, official title and summary.) The measure also called for lifetime Global Positioning System monitoring of registered felony sex offenders. (*Ibid.*)

With respect to the SVPA, the measure's introductory language stated that "[e]xisting laws that provide for the commitment and control of sexually violent predators must be strengthened and improved." (Prop. 83, § 2, subd. (h).) Section 2, subdivision (k) of the initiative stated "California is the only state, of the number of states that have enacted laws allowing involuntary civil commitments for persons identified as sexually violent predators, which does not provide for indeterminate commitments. California automatically allows for a jury trial every two years irrespective of whether there is any evidence to suggest or prove that the committed person is no longer a sexually violent predator. As such, this act allows California to protect the civil rights of those persons committed as a sexually violent predator while at the same time protect society and the system from unnecessary or frivolous jury trial actions where there is no competent evidence to suggest a change in the committed person." (*Ibid.*)

The proposition proposed changes to three of the SVPA provisions identified by the Commission as a basis for the state-mandated duties. The measure modified Welfare and Institutions Code section 6604 so that SVPs would be committed for an indeterminate term, rather than a two-year term that could be extended with a court order. (Ballot Pamp., Gen. Elec. (Nov. 7, 2006) text of Prop. 83, p. 137 (§ 6604) (hereafter

10

Pamphlet).)  The proposition modified Welfare and Institutions Code section 6605, subdivision (b), to require the DMH to deem an SVP's condition changed before he or she could petition the court for conditional release or unconditional discharge. (Pamphlet, text of Prop. 83, p. 137 (§ 6605).)   Before the measure, the statute required annual notice to the person of his or her right to petition and an annual examination of the person's mental condition by the DMH.  (*Ibid*.)  Finally, the proposition proposed a minor modification to Welfare and Institutions Code section 6608.  The existing provision stated a committed person could petition for "conditional release *and subsequent* unconditional discharge," and Proposition 83 amended the sentence to state that a committed person could petition for "conditional release *or an* unconditional discharge." (Pamphlet, text of Prop. 83, p. 138 (§ 6608), italics added.)

The ballot initiative also proposed to amend provisions of the SVPA that were excluded by the Commission as a basis for the state mandate.  The measure expanded the definition of SVP to include persons convicted of a sexually violent offense against only one victim.  (Pamphlet, text of Prop. 83, p. 135 (§ 6600, subd. (a)(1)).)  Prior to the initiative, the law required the person to be convicted of offenses against two or more victims.  (*Ibid*.)  The measure also removed the limitation on the number of juvenile adjudications that count as a sexually violent offense (the existing law was limited to one).  (Pamphlet, text of Prop. 83, pp. 135-136 (§ 6600, subds. (a)(1) & (g)).)   Finally, the measure modified Welfare and Institutions Code section 6601, subdivision (k), so that any parole imposed on a person deemed an SVP runs consecutive to, rather than

11

simultaneously with, a civil commitment.  (Pamphlet, text of Prop. 83, p. 137 (§ 6601, subd. (k).)

Proposition 83 also contained a provision to limit the Legislature's ability to weaken or repeal any change made by the measure:  "The provisions of this act shall not be amended by the Legislature except by a statute passed in each house by rollcall vote entered in the journal, two-thirds of the membership of each house concurring, or by a statute that becomes effective only when approved by the voters.  However, the Legislature may amend the provisions of this act to expand the scope of their application or to increase the punishments or penalties provided herein by a statute passed by majority vote of each house thereof."  (Pamphlet, text of Prop. 83, p. 138.)

As required by the Election Code, in September 2006 the director of the DOF and the legislative analyst provided a joint letter to the Attorney General outlining the expected changes in revenues and costs associated with Proposition 83.[6]  With respect to the costs specifically related to changes to the SVPA, the analysis stated "the measure is likely to result in an increase in state operating costs in the tens of millions of dollars annually to (1) conduct preliminary screenings of additional sex offenders referred to the

---

[6]    The Elections Code requires the Attorney General to "prepare a circulating title and summary of the chief purposes and points of [a] proposed measure" (Elec. Code, § 9004, subd. (a)) that includes "in boldface print . . . either the estimate of the amount of any increase or decrease in revenues or costs to the state or local government, or an opinion as to whether or not a substantial net change in state or local finances would result if the proposed initiative is adopted."  (Elec. Code, § 9005, subd. (a).)  The estimate or opinion is made "jointly by the Department of Finance and the Legislative Analyst," who may rely on the statement of fiscal impact prepared by the legislative analyst under section 12172, subdivision (b).  (Elec. Code, § 9005, subd. (b).)

DMH by [the Department of Corrections and Rehabilitation] for an SVP commitment, (2) complete full evaluations by psychiatrists or psychologists to ascertain the mental condition of criminal offenders being further considered for an SVP commitment, (3) provide court testimony in SVP commitment proceedings, and (4) reimburse counties for their costs for participation in the SVP commitment process."

The analysis noted some of the costs would be offset by the longer prison sentences imposed on persons convicted of sexually violent offenses, but concluded that "the SVP-related provisions of th[e] measure could result in a net increase in state operating costs of at least $100 million after a few years." The voter information guide informed voters that the *state's* costs related to sexually violent predator commitments would likely increase, stating "on balance the operating and capital outlay costs to the state are likely to be substantially greater than the savings." The material provided to voters did not identify any new costs to be imposed on local governments as a result of the referendum, and contained no indication that costs to local governments subsidized by the state would or could be shifted to local governments as a result of the initiative.

As the initiative was in the process of reaching the ballot, the Legislature was simultaneously working on changes to the laws relating to sex offenders. On January 9, 2006, Senate Bill 1128 was introduced to enact "the Sex Offender Punishment, Control, and Containment Act of 2006, a comprehensive strategy to protect California communities from sex offenders." (Leg. Counsel's Dig., Sen. Bill No. 1128 (2005-2006 Reg. Sess.).) The bill was approved by the Legislature on August 31, 2006, as urgency legislation and became effective on September 20, 2006. (Sen. Bill No. 1128 (2005-2006

13

Reg. Sess.).)  The legislation contained some, but not all, of the changes to the SVPA presented in Proposition 83.  It did not amend the law to include SVPs who only committed crimes against one victim, or remove the limit on the number of juvenile offenses available to be considered as a basis for a civil commitment.  (Sen. Bill No. 1128 (2005-2006 Reg. Sess.) § 53.)  Senate Bill No. 1128 did provide for tolling of the term of parole while the SVP was civilly committed and for indeterminate commitments, rather than two-year terms.  (*Ibid.*)

On November 7, 2006, the voters approved Proposition 83, which became effective immediately.  The initiative overrode the modifications made to the Welfare and Institutions Code by Senate Bill No. 1128.

D.  Redetermination of Earlier Test Claim

The year before the passage of Proposition 83, the Legislature amended section 17556 to direct the Commission to " 'set-aside' some of its test claim decisions and to 'reconsider' other test claim decisions.  (Legis. Counsel's Dig., Assem. Bill No. 138 (2005-2006 Reg. Sess.).)"  (*California School Boards, supra*, 171 Cal.App.4th at p. 1191.)  In *California School Boards* the court determined that amendment to section 17556 was invalid on the grounds that its direction to the Commission to revisit specific earlier decisions was a violation of the separation of powers doctrine.  (*Id*. at pp. 1200-1201.)  The court held: "[l]ike a judicial decision, a quasi-judicial decision of the Commission is not subject to the whim of the Legislature.  Only the courts can set aside a specific Commission decision and command the commission to reconsider."  (*Id*. at p. 1201.)

*California School Boards* did not address whether the Commission had the ability to reconsider a decision on its own, but noted that "[o]ver time, any particular decision of the Commission may be rendered obsolete by changes in the law and material circumstances that originally justified the Commission's decision. While decisions of the Commission are not subject to collateral attack, logic may dictate that they must be subject to some procedure for modification after changes in the law or material circumstances. . . . In deciding that the Legislature cannot direct, on a case-by-case basis, that a final decision of the Commission be set aside or reconsidered, we do not imply that there is no way to obtain reconsideration of a Commission decision when the law or material circumstances have changed. We only conclude that the Legislature's attempt to force a reconsideration in this case violated the separation of powers doctrine. Whether the Commission, exercising inherent powers, may agree to reconsider a decision or the Legislature may provide, generally, a process for obtaining reconsideration of a decision is beyond the scope of this opinion." (*California School Boards, supra*, 171 Cal.App.4th at pp. 1202-1203, fn. omitted.)

In 2010, in response to *California School Boards*, the Legislature enacted section 17570. (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 856 (2009-2010 Reg. Sess.) as amended Oct. 6, 2010, p. 4 ["This bill is responsive to issued raised by a 2009 Third Appellate District Court ruling in *California School Boards Association v. State of California* where the court found the Legislature's practice of referring mandates back to the Commission for redetermination was unconstitutional. This bill establishes a constitutional process for mandate redetermination."].) The

15

provision set forth a procedure to reassess an earlier Commission decision when the state's liability "has been modified based on a subsequent change in law."  (§ 17570, subd. (b).)

Section 17570 defines a "[s]ubsequent change in law" as "a change in law that requires a finding that an incurred cost is a cost mandated by the state, as defined by Section 17514, or is not a cost mandated by the state pursuant to Section 17556, or a change in mandates law, except that a 'subsequent change in law' does not include the amendments to Section 6 of article XIII B of the California Constitution that were approved by the voters on November 2, 2004.  A 'subsequent change in law' also does not include a change in the statutes or executive orders that impose new state-mandated activities and require a finding pursuant to subdivision (a) of Section 17551."  (§ 17570.)

Section 17570 also required the Commission to establish a two-step hearing process for revisiting an earlier decision.  (§ 17570, subd. (d)(4).)  "As the first step, the [C]ommission shall conduct a hearing to determine if the requester has made a showing that the state's liability pursuant to subdivision (a) of Section 6 of Article XIII B of the California Constitution has been modified based on a subsequent change in law.  If the [C]ommission determines that the requester has made this showing, then pursuant to the [C]ommission's authority in subdivision (b) of this section, the [C]ommission shall notice the request for a hearing to determine if a new test claim decision shall be adopted to supersede the previously adopted test claim decision."  (*Ibid*.)

Regulations adopted by the Commission under section 17570 state the Commission must find "that the requester has made an adequate showing" at the first

16

hearing if "the request, when considered in light of all of the written comments and supporting documentation in the record of this request, has a substantial possibility of prevailing at the second hearing." (Cal. Code Regs., tit. 2, § 1190.5, subd. (a)(1).) At the second hearing, the Commission determines if the state's liability has been modified and, if so, "adopt[s] a new decision that reflects the modified liability of the state." (Cal. Code Regs., tit. 2, § 1190.5, subd. (b)(1).)

On January 15, 2013, the DOF filed a request for redetermination of the Commission's June 25, 1998 statement of decision concerning the SVPA. The request asserted that the passage of Proposition 83 constituted a subsequent change in the law under section 17570. The DOF contended that because "all of the Welfare and Institutions Code sections of the SVP mandate are either expressly included in Prop 83 or are necessary to implement Prop 83," the costs incurred by local agencies "to comply with the SVP mandate [are] no longer a cost mandated by the state."

The DOF asserted that because Welfare and Institutions Code sections 6601, 6604, 6605 and 6608 were amended and reenacted by Proposition 83, "the voters reenacted the entirety of those sections, 'including the portions not amended,' and therefore the test claim statutes impose duties expressly included in the voter-enacted ballot measure." The DOF further asserted that " 'the remainder of the mandate's Welfare and Institutions Code sections that were not expressly included in the ballot measure are, nevertheless, necessary to implement the ballot measure.' " The Counties of Los Angeles and San Bernardino, the California District Attorneys Association, the California State Associate

17

of Counties, the California Public Defenders' Association, and several local prosecutors and public defenders opposed the DOF's request for redetermination.

The opposing agencies and associations argued (1) Proposition 83 did not substantively change any of the statutes that implemented the civil commitment program; (2) the definition of a change in law contained in section 17570 was unconstitutionally vague and violated the separation of powers doctrine; and (3) the DOF was estopped from obtaining a redetermination of the 1998 decision because the ballot materials for Proposition 83 represented that there would be no change in costs to local governments and the DOF had represented to the Attorney General in its analysis of the ballot measure that the costs of the SVP program would remain reimbursable by the state. On July 26, 2013, the Commission adopted its statement of decision rejecting all of the objections to the DOF's request and concluding the DOF had adequately shown the state's liability had been modified by Proposition 83.

The Commission reasoned that "[t]he analysis of whether a subsequent change in the law has occurred turns on whether, under section 17556[, subdivision] (f), there are now any costs mandated by the state, where a ballot measure expressly includes some of the same activities as the test claim statutes that were found to impose a reimbursable mandate in [the Commission's 1998 test claim decision] CSM-4509." The Commission then found the DOF had made an adequate showing that it had a substantial possibility of prevailing at the second hearing because "the test claim statutes impose duties that are expressly included in a voter-enacted ballot-measure."

18

After receiving additional written comments opposing the DOF's request, and the DOF's responses to those comments, and after two days of public hearings, on December 6, 2013, the Commission issued a final statement of decision granting the DOF's request for redetermination and *partially* approving the DOF's request to end reimbursement for the activities identified in the 1998 test claim decision. The Commission again rejected the comments of the constituents who opposed the DOF's petition and found that with two exceptions, the activities previously found to be reimbursable state-mandated costs were no longer reimbursable state mandates. It concluded that the costs of "[p]reparation and attendance by the county's designated counsel and indigent defense counsel at the probable cause hearing" and "[t]ransportation for each potential sexually violent predator from a secured facility to the probable cause hearing" were neither expressly included in Proposition 83 nor necessary to implement the measure and, therefore, remained state-mandated under Welfare and Institutions Code section 6602 and reimbursable.

On February 28, 2014, the Counties filed a petition for writ of administrative mandamus and complaint for declaratory relief under sections 17514 and 17559, subdivision (b) and Code of Civil Procedure sections 1094.5 and 1060 in San Diego County Superior Court against the Commission, the State of California, the DOF, and John Chiang in his official capacity as the California State Controller.[7] The Counties sought an order finding (1) the Commission's July 26, 2013 and December 6, 2013 statements of decision were not supported by substantial evidence and (2) sections 17556,

_____

[7] The Commission answered the petition on its own behalf and the Attorney General answered the petition on behalf of the State of California, the DOF, and the Controller.

19

subdivision (f) and 17570 are unconstitutional and, therefore, could not serve as a basis for the Commission's redetermination of its 1998 statement of decision.[8]  After briefing and a hearing, on April 24, 2015, the trial court denied the Counties' requested relief and judgment was entered against them on May 12, 2015.

The trial court's order concluded that the definition of "subsequent change in the law" found in section 17570 did not conflict with article XIII B, section 6 because the language of the provision "comports with how state-mandated and voter-approved mandates are funded."  The court, referring to article XIII B, section 6, subdivision (b), reasoned that Proposition 83 constituted a subsequent change in the law because it "changed the funding dynamic of the SVP Act" by eliminating the Governor's ability to defund the mandate "through [his] line item veto power."  The court further stated, "even if Prop 83 is construed as a simple reenactment, the effect of voter-approval cannot be ignored as transforming certain requirements of the Act into voter-approved mandates."

DISCUSSION

On appeal, the Counties assert the Commission and the trial court erred in concluding that Proposition 83 constituted a subsequent change in the law that absolved the state of part of its funding liability for the civil commitment procedures created by the SVPA.  The Counties also assert that the Commission's interpretation of the phrase

---

8    The Counties also separately asserted there was no subsequent change in the law with respect to a small number of cases in Los Angeles County that are by stipulation not subject to Proposition 83.  The Counties do not appeal the trial court's ruling with respect to these cases.

20

"subsequent change in the law" in section 17570 conflicts with the intent and purpose of article XIII B, section 6, subdivision (a) and is unconstitutionally overbroad.

The Commission and the state respond that because Proposition 83 was approved by the voters and the initiative modified some of the statutory provisions that formed the basis for the Commission's 1998 statement of decision, the Commission and the trial court correctly found that the source of the mandated costs was now the People, and not the Legislature. They assert section 17570 does not conflict with article XIII B, section 6 precisely because Proposition 83 changed the character of the mandate. The Attorney General also contends the statute is not unconstitutionally overbroad because section 17570 contains a clear definition of the phrase "subsequent change in the law" and references the "definable sources" of sections 17514 and 17556.

Whether Proposition 83 negated part of the state mandate found by the Commission in 1998 is subject to our independent review. It is a purely a legal question requiring no reliance on disputed facts. (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 109; *City of Richmond v. Commission on State Mandates* (1998) 64 Cal.App.4th 1190, 1195; see *Department of Finance, supra*, 1 Cal.5th at p. 762 ["The question whether a statute or executive order imposes a mandate is a question of law."].) As we explain, we reverse the decision of the trial court and hold that the Commission incorrectly interpreted sections 17556, subdivision (f) and 17570 to find there had been a subsequent change in the law that diminished the state's liability for the costs identified by the Commission in its 1998 statement of decision.

21

"In construing any statute, '[w]ell-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' [Citation.] 'We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context.' [Citation.] If the statutory language is unambiguous, 'we presume the Legislature meant what it said, and the plain meaning of the statute governs.' " (*Whaley v. Sony Computer Entertainment America, Inc.* (2004) 121 Cal.App.4th 479, 484-485.

"If, however, the statutory language is ambiguous or reasonably susceptible to more than one interpretation, we will 'examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes,' and we can ' " 'look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " ' " (*Pacific Sunwear of California, Inc. v. Olaes Enterprises, Inc.* (2008) 167 Cal.App.4th 466, 474.

" ' "We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citation.] Further, 'We presume that the [enacting

legislative body], when enacting a statute, was aware of existing related laws and intended to maintain a consistent body of rules. [Citation.]' " (*Doe v. Brown* (2009) 177 Cal.App.4th 408, 417-418.)

Additionally, "[i]f 'the terms of a statute are by fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution, the statute will be given that meaning, rather than another in conflict with the Constitution.' [Citations.] Consequently, '[i]f feasible within bounds set by their words and purposes, statutes should be construed to preserve their constitutionality.' " (*Metromedia, Inc. v. City of San Diego* (1982) 32 Cal.3d 180, 186.) "There are limits, however, to the ability of a court to save a statute through judicial construction;" the court may not " ' "in the exercise of its power to interpret, rewrite the statute." ' " (*Id*. at p. 187.)

## II

The relevant constitutional and statutory provisions are set forth in the background section, but merit repeating. Under article XIII B, section 6, subdivision (a) of the California Constitution, "[w]henever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse that local government for the costs of the program or increased level of service . . . ." (Cal. Const., art. XIII B, § 6, subd. (a).) Section 17514 defines "Costs mandated by the state" as "any increased costs which a local agency or school district is required to incur after July 1, 1980, as a result of any statute enacted on or after January 1, 1975, or any executive order implementing any statute enacted on or after January 1, 1975, which mandates a new program or higher level of service of an

23

existing program within the meaning of [s]ection 6 of [a]rticle XIIIB of the California Constitution."

Under section 17556, subdivision (f), statutes that "impose[] *duties that are necessary to implement, or are expressly included in, a ballot measure* approved by the voters in a statewide or local election" are excluded from the subvention requirement contained in article XIII B, section 6, subd. (a).  (§ 17556, subd. (f), italics added.)  This exemption for duties imposed by a ballot initiative applies "regardless of whether the statute or executive order was enacted or adopted before or after the date on which the ballot measure was approved by the voters."  (*Ibid.*)

Section 17570, subdivision (b) allows the Commission to "adopt a new test claim decision to supersede a previously adopted test claim decision only upon a showing that the state's liability for that test claim decision pursuant to subdivision (a) of Section 6 of Article XIII B of the California Constitution has been modified based on a subsequent change in law."  (§ 17570, subd. (b).)  A "subsequent change in law" is defined as "a change in law that requires a finding that an incurred cost is a cost mandated by the state, as defined by Section 17514, or is not a cost mandated by the state pursuant to Section 17556 . . . ."  (§ 17570, subd. (a)(2).)

## III

The question we must answer is whether Proposition 83 converted the duties imposed on the Counties by the SVPA, and that the Commission previously determined were state-mandated, into duties that are instead mandated by the People.  As the Attorney General states:  "The source of authority that mandates the program or service

24

determines whether the reimbursement requirement under [article XIII B, section 6, subdivision (a)] applies." (Italics omitted.) Sections 17556 and 17570 do not easily answer this novel question. We conclude, however, that the interpretation of section 17556, subdivision (f) adopted by the Commission and the trial court is too broad. We adopt a narrow construction of sections 17556, subdivision (f) and 17570 and hold that a ballot initiative that modifies statutes previously found to impose a state mandate only changes the source of the mandate if the initiative changes the duties imposed by the statutes. Under this narrow construction, the source of the SVPA mandate remains the state and the six duties at issue are subject to the Constitution's subvention requirement.

A

The Commission may revisit an earlier test claim decision if the state's liability for that decision has been modified because of a "subsequent change in law." (§ 17570, subd. (b).) The definition of "subsequent change in law" contained in section 17570, subdivision (a), circularly, refers to sections 17514 and 17556. Sections 17514 and 17556 in turn define, respectively, what constitutes a state-mandated program and what does not. These statutes, however, do not explicitly address how the source of the mandate should be characterized when a statutory provision previously found to impose a state mandate is amended by a ballot initiative. Because the provisions are ambiguous in this regard, we are tasked with adopting a statutory construction that "harmonizes the statute[s] internally and with related statutes" and that preserves the constitutionality of the statutes. (*City of Dana Point v. California Coastal Com.* (2013) 217 Cal.App.4th 170, 195; *Metromedia, Inc. v. City of San Diego, supra*, 32 Cal.3d at pp. 186-187.)

25

Although Proposition 83 amended the SVPA, the measure did not change any of the duties the law imposed on the Counties and that the Commission found were state-mandated. As set forth above, the 1998 statement of decision identified eight duties mandated by the SVPA that imposed costs on the Counties. Those duties can be described as providing legal representation and mental health expertise for both the county and the alleged SVP in commitment proceedings, and providing housing and transportation for the alleged SVP leading up to and during those proceedings. The Commission identified the specific Welfare and Institution Code provisions it determined were the basis for these activities and denied the test claim with respect to the "remaining provisions of the test claim legislation because [those remaining provisions] do not impose **reimbursable** state mandated activities upon local agencies."

As discussed, just three of the Welfare and Institution Code provisions the Commission identified as forming the basis for the state-mandated activities were modified by Proposition 83.[9] Although the initiative made changes to these statutes,

_____

9     The defendants include a fourth relevant statute, section 6601, as being amended by Proposition 83. That amendment, however, did not change subdivision (i), which the Commission found was a basis for the duties of (1) designating counsel for the county, (2) initial review of the DMH's commitment recommendation by county counsel, and (3) preparation and filing of the commitment petition. Subdivision (i) provides, "If the county's designated counsel concurs with the recommendation, a petition for commitment shall be filed in the superior court of the county in which the person was convicted of the offense for which he or she was committed to the jurisdiction of the Department of Corrections and Rehabilitation. The petition shall be filed, and the proceedings shall be handled, by either the district attorney or the county counsel of that county. The county board of supervisors shall designate either the district attorney or the county counsel to assume responsibility for proceedings under this article." Proposition 83 amended only subdivision (k) of Welfare and Institutions Code section 6601 to require parole be tolled and not run consecutively with an SVP commitment.

26

critically to our interpretation of section 17556, subdivision (f), the changes were not to

the state-mandated duties.  Proposition 83 amended Welfare and Institutions Code section

6604 to extend the term of commitment from two years to an indeterminate term.[10]  This

provision was identified in the 1998 statement of decision, along with Welfare and

Institutions Code section 6603,[11] as the basis for the Counties' obligation to designate

their own counsel and counsel for indigent offenders to prepare for and attend trial on an

SVP petition.  Proposition 83 amended Welfare and Institutions Code section 6605,

subdivision (b), to require the DMH to deem an SVP's condition changed before he or

she is permitted to petition for release, and amended Welfare and Institutions Code

section 6608, subdivision (a), to state that a committed person may petition for a

---

[10]     Welfare and Institutions Code section 6604 now provides:  "The court or jury shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator. If the court or jury is not satisfied beyond a reasonable doubt that the person is a sexually violent predator, the court shall direct that the person be released at the conclusion of the term for which he or she was initially sentenced, or that the person be unconditionally released at the end of parole, whichever is applicable.  If the court or jury determines that the person is a sexually violent predator, the person shall be committed for an indeterminate term to the custody of the State Department of State Hospitals for appropriate treatment and confinement in a secure facility designated by the Director of State Hospitals.  The facility shall be located on the grounds of an institution under the jurisdiction of the Department of Corrections and Rehabilitation." (Welf. & Inst. Code, § 6604.)

[11]     Welfare and Institutions Code section 6603 was not modified by Proposition 83. It provides explicit statutory authority for the alleged SVP's right to counsel, right to a jury trial, and right to a unanimous verdict that commitment is warranted if the petition is tried to a jury.  (Welf. & Inst. Code, § 6603, subds. (a)-(b), (f).)  It also gives the attorney petitioning for commitment the right to request an updated evaluation of the offender or a replacement evaluation if the original evaluator is not available to testify at trial, and authorizes either party to request the court issue a subpoena for the records reviewed by the person who conducts an evaluation.  (Welf. & Inst. Code, § 6603, subds. (c), (i)-(j).)

27

"conditional release *or* an unconditional discharge without the recommendation or concurrence of the Director of Mental Health."[12]  (Pamphlet, text of Prop. 83, pp. 137, 138 (§§ 6605, 6608).)  The 1998 statement of decision identified these two subdivisions (Welf. & Inst. Code, §§ 6605, subd. (b) and 6608, subd. (a)), along with subdivision (c) and former subdivision (d) of Welfare and Institutions Code section 6605 and subdivisions (b) through (d) of Welfare and Institutions Code section 6608, as the basis for the duty of county and indigent defense counsel to prepare for and attend "subsequent hearings regarding the condition of the" SVP.

The first change, extending the term of commitment under section 6604, did not impact the duty the Commission found was imposed by Welfare and Institutions Code sections 6603 and 6604 in its 1998 statement of decision.  The duty, "preparation and attendance by the county's designated counsel and indigent defense counsel at trial,"

_____

[12]     Welfare and Institutions Code section 6605, subdivision (b), has been modified since the passage of Proposition 83.  Before the ballot initiative was passed, subdivision (b) of the statute required the director of the DMH to provide a committed person with annual notice of his or her right to petition the court for release.  Proposition 83 removed this requirement and instead authorized the DMH to authorize the person to petition the court for conditional release or an unconditional discharge if it determined the person's condition changed so that he or she no longer meets the definition of an SVP.  The proposition did not, however, change Welfare and Institutions Code section 6608, which allowed an SVP to petition for release even if he or she is not provided authorization from the DMH.  (Pamphlet, text of Prop. 83, p. 138 (§ 6608).)  The statute was amended by Senate Bill No. 295 in 2013 to clarify which procedures must be used when a committed person petitions for unconditional release, or when a committed person petitions for conditional release.  Senate Bill 295 also shifted the burden of proof from the committed person to the state when the State Department of Hospital's annual evaluation indicates that conditional release to a less restrictive alternative is in the best interests of the person and that conditions can be imposed to adequately protect the community.  (Sen. Bill No. 295 (2013-2014 Reg. Sess.) § 2.)

exists regardless of the term of commitment the SVP faces and, therefore, remained the same after Proposition 83 was passed. Likewise, the changes to Welfare and Institutions Code sections 6605, subdivision (b) and 6608, subdivision (a) did not alter the duties those provisions imposed on local governments. Those duties, "[p]reparation and attendance by the county's designated counsel and indigent defense counsel at subsequent hearings regarding the condition of the sexually violent predator," remained the same after the passage of Proposition 83.

Because the duties imposed by the statutes at issue were not affected by Proposition 83, we reject the Commission's conclusion that the duties are "necessary to implement or expressly included" the measure, and hold that the exclusion contained in section 17556, subdivision (f), does not apply. As the Attorney General states: "The relevant question in a mandates determination is whether, in the absence of a statutory provision that requires the duties at issue, local agencies would nevertheless have to perform the duties at issue" because of the existence of the ballot measure. In this case, in the absence of Proposition 83, local agencies would still be required to perform the duties as mandated by the SVPA. The opposite is not true. In the absence of the SVPA, as enacted by the Legislature, the specific duties at issue would not exist.

Our conclusion is supported by the California Supreme Court's decision in *San Diego Unified School Dist. v. Commission on State Mandates* (2004) 33 Cal.4th 859 (*San Diego Unified*), which addressed questions about the source of a mandate analogous to those presented here. In *San Diego Unified* the Commission and the courts were tasked with determining if certain procedural safeguards required for public schools in expulsion

29

proceedings were mandated by state law or federal law.  Like duties mandated by a ballot initiative, section 17556 also excludes costs mandated by federal law from the subvention requirement of article XIII B, section 6, subdivision (a).  (§ 17556, subd. (c).)  The Education Code provisions at issue in *San Diego Unified* provided for specific procedural protections when a school principal recommended expulsion at his or her discretion, and when a school principal was *required* to recommend expulsion because a student brought a firearm to school.  (Ed. Code, §§ 48915, 48918.)

*San Diego Unified* held that the costs of the procedural protections afforded under the Education Code for mandatory expulsion for bringing a firearm to school were state-mandated, while those for discretionary expulsion were federally-mandated and, therefore, excluded from state subvention.  (*San Diego Unified, supra*, 33 Cal.4th at p. 880, 884.)  The *San Diego Unified* court reasoned that with respect to discretionary expulsion, the procedural protections contained in Education Code sections 48915 and 48918 were "designed to make the [student's] underlying *federal right* enforceable and to set forth procedural details that were not expressly articulated in the case law establishing the respective rights. . . ."  (*San Diego Unified,* at p. 889, italics added.)  The costs associated with affording those protections, therefore, were federally mandated and fell within the exclusion to the subvention requirement found in section 17556, subdivision (c).  (*San Diego Unified,* at p. 889.)

The court concluded that the procedural protections afforded for mandatory expulsion proceedings, in contrast, were state-mandated and not subject to the exclusion found in section 17556, subdivision (c).  (*San Diego Unified, supra*, 33 Cal.4th at p. 880.)

30

At the time the case was decided, only California's statutes, and not federal law, required "an expulsion recommendation—or expulsion—for firearm possession" by a public school student. (*Id*. at p. 881.) The costs associated with such proceedings, therefore, were not subject to section 17556's exclusion: "[I]n its mandatory aspect, Education Code section 48915 appears to constitute a state mandate, in that it establishes conditions under which the state, rather than local officials [as in a discretionary expulsion proceeding], has made the decision requiring a school district to incur the costs of an expulsion hearing." (*San Diego Unified,* at p. 880.)

Here, the duties and costs at issue did not arise from Proposition 83. Unlike the federal due process protections afforded in a discretionary expulsion considered in *San Diego Unified*, the duties at issue here arose from the creation of the SVPA by the Legislature in 1995, not from Proposition 83's modifications to that law. The subsequent amendment of some of the provisions contained in the SVPA did not alter the source of the mandate in the way advanced by the defendants. Indeed, the provision providing explicitly for the right to a jury trial, the assistance of counsel and the right to retain experts, Welfare and Institutions Code section 6603, was not amended at all by Proposition 83. Without the initial enactment of the SVPA by the Legislature, it is conjecture to conclude, as the Attorney General does, that "local agencies would nevertheless have to perform the duties at issue."[13]

---

[13] The Commission's rejection of the DOF's request for redetermination with respect to the costs associated with the probable cause hearing illustrates the point. The two duties related to probable cause hearings were excluded from the Commission's decision because Proposition 83 makes no reference to such hearings. All of the identified duties,

31

The Attorney General and the Commission also contend that Proposition 83 constituted a subsequent change in the law that modified the state's liability because the initiative broadened the definition of SVP contained in Welfare and Institutions Code section 6600 and because the measure's "amendment clause" prohibits the Legislature from weakening the parts of the code the measure amended. The Commission's 1998 decision, however, concluded that Welfare and Institutions Code section 6600 was not a basis for any of the duties for which the Counties sought reimbursement.[14] Likewise, the initiative's amendment clause did not impact any of the duties imposed by the SVPA or change the source of the mandated duties.[15]

_____

however, are required under the SVPA regardless of the changes made by the ballot initiative.

[14]    In its opposition to the Counties' petition, the Attorney General asserted that Proposition 83 "dramatically extended the reach of the SVPA by expanding the definition of a 'sexually violent predator' and lifting the ceiling on the number of juvenile adjudications that could count as a sexually violent offense." In support of this assertion, the Attorney General cited a 2012 report issued by the California Department of Mental Health as required by Welfare and Institutions Code section 6601, subdivision (m), which stated the number of referrals received by the Department of Corrections increased " 'nearly 800 percent' " after the passage of Proposition 83 and Senate Bill No. 1128. The Counties contend the trial court abused its discretion by granting the Attorney General's request for judicial notice of this report. We agree with the Attorney General that even if the court did err in granting its request for judicial notice, the error was not prejudicial. In addition, the report does not provide any evidence concerning the impact, if any, that Proposition 83 and Senate Bill No. 1128 had on *counties'* SVP commitment duties.

[15]    The Attorney General argues the "Amendment Clause may have been prompted by legislative proposals that, if enacted, would have conflicted with the expanded provisions of Proposition 83" and cites to an analysis by the Senate Commission on Public Safety prepared for a hearing on Senate Bill No. 1128. The analysis, however, does not imply that any member of the Legislature did not support expanding the

B

The Commission and the trial court concluded *any* modification by ballot initiative to a statute that supports what has previously been adjudged a state mandate converts the source of the mandate from one imposed by the Legislature to one imposed by the People. This construction of sections 17570 and 17756, subdivision (f) does not align with the purpose and policy of this state's mandate law. As discussed, article XIII B, section 6, subdivision (a) was enacted "to preclude the state from shifting financial responsibility for carrying out governmental functions to local agencies, which are 'ill equipped' to assume increased financial responsibilities because of the taxing and spending limitations that articles XIII A and XIII B impose." (*County of San Diego v. State of California, supra,* 15 Cal.4th at p. 81.) Defining a "subsequent change in the law" to include *any* modification to a state-mandated program by ballot initiative, as the Commission did, and not limiting the provisions to those modifications that change the duties imposed on local governments (or that impose new duties) directly conflicts with this constitutional dictate.

Further, that interpretation leads to an absurd result, allowing the state to avoid the subvention requirement by advancing propositions that reenact without changing or that only marginally modify existing laws. This broad interpretation of the definition of "subsequent change in the law" under sections 17556, subdivision (f) and 17570 would allow the state to avoid its constitutional obligation to fund the costs it has placed on local

definition of an SVP as the Attorney General suggests. It merely contains counterarguments to the changes proposed by the bill.

33

governments, which are limited in their ability to raise funds by article XIII A. (*Department of Finance, supra*, 1 Cal.5th at p. 762; *County of Los Angeles, supra*, 43 Cal.3d at p. 61.)

Our narrow interpretation of these Government Code provisions is also supported by the "reenactment rule" advanced by the Counties. Under the Constitution, "[a] section of a statute may not be amended unless the section is re-enacted as amended." (Cal. Const., art. IV, § 9.) A ballot initiative, therefore, must restate the entire provision it proposes to amend. Section 9605 further provides, "[w]here a section or part of a statute is amended, it is not to be considered as having been repealed and reenacted in the amended form. The portions which are not altered are to be considered as having been the law from the time when they were enacted; the new provisions are to be considered as having been enacted at the time of the amendment; and the omitted portions are to be considered as having been repealed at the time of the amendment." (§ 9605.)

The purposes of this "reenactment rule" is to "is to avoid ' "the enactment of statutes in terms so blind that [the legislative body is] deceived in regard to their effect, and the public, from the difficulty of making the necessary examination and comparison, fail[s] to become [apprised] of the changes made in the laws." ' " (*American Lung Assn. v. Wilson* (1996) 51 Cal.App.4th 743, 748.) Under the rule, it is the *actual changes* made by Proposition 83 that are relevant to the inquiry of whether the initiative changed the source of the mandate. To the extent that the Welfare and Institutions Code provisions were restated by the initiative to comply with the restatement rule, those restatements are not relevant. (See *In re Oluwa* (1989) 207 Cal.App.3d 439, 446 ["amendment of a

34

portion of a statute has no effect on portions which remain unchanged"]; *County of Sacramento v. Pfund* (1913) 165 Cal. 84, 88 ["to construe a statute amended in certain particulars as having been wholly reenacted as of the date of the amendment, is to do violence to the code and all canons of construction"].)

To refute this point, the Attorney General relies on a footnote in *Yoshisato v. Superior Court* (1992) 2 Cal.4th 978 and asserts the Supreme Court held that although the effective date of an unchanged, but reenacted statute, remains the same, the statute is reenacted for purposes of a mandate determination. *Yoshisato*, however, addressed whether changes to the same Penal Code statute by two ballot initiatives simultaneously passed were both effective. (*Id*. at p. 981.) The People argued section 9605 supported their position that the initiative that garnered the most votes was competing against the other initiative directly and, therefore, only the initiative with the most votes was operative. (*Yoshisato,* at p. 989.)

The Supreme Court rejected this assertion and held that "when a statute is 'reenacted' under the compulsion of the Constitution" the reenactment does not, "in and of itself, reflect intent of the voters to adopt a 'comprehensive scheme' that would prevail over all other provisions of any other measure enacted by a lesser affirmative vote at the same election." (*Yoshisato v. Superior Court, supra*, 2 Cal.4th at p. 990.) *Yoshisato* does not, as the Attorney General contends, address the question of whether a technical reenactment required by section 9605, without any change from existing law, changes the source of a mandate.

Finally, the conclusion we reach is also supported by the fact that the initiative did not purport to remove the state's liability for costs it was required to reimburse to counties under the 1998 statement of decision. The parties agree that the statutory mechanism for the state to request a reevaluation of the 1998 determination, created by section 17570 in 2010, was not yet in place at the time the initiative was presented to voters. The exclusion contained in section 17556, subdivision (f), however, was part of the statute as it was originally enacted in 1984. (Stats. 1984, ch. 1459, § 1, p. 5119.) There was no barrier for the state to challenge its subvention obligation under article XIII B, section 6, subdivision (a), following the passage of Proposition 83. Further, if the proponents of a ballot initiative that amends the statutory provisions that are the basis for an existing state mandate propose to also eliminate the state's liability for the program, the ballot measure can easily indicate this intent.

C

In its order denying the petition, the trial court stated that Proposition 83 constituted a "subsequent change in the law" because "voter approval" of the initiative "changed the funding dynamic of the SVP Act." The court explained: "The state is required to reimburse local agencies for state-imposed mandates" but "[v]oter-approved mandates are not subject to defunding through the Governor's line item veto power. [Citation.] Thus, through this voter-approved mandate procedure of re-enacting the SVP Act, the Act cannot be defunded by the State." This, according to the order, "constitutes a subsequent change in law." The Attorney General reiterates this point on appeal, contending that because "the six duties are now voter-imposed duties through voter

36

approval of Proposition 83, no funding decision by the Legislature (either to fund or not fund) or the Governor (either to exercise his line-item veto power or not) can suspend operation of the duties."

The trial court's conclusion, however, puts the cart before the horse. Article XIII B, section 6, subdivision (b), adopted in 2004, requires the Legislature to either appropriate funds for a program that the Commission has determined is state-mandated under section 6, subdivision (a), or suspend the operation of the mandate for the year for which it does not provide funding. (Cal. Const., art. XIII B, § 6, subd. (b)(1).) The trial court and the Attorney General correctly point out that if the source of a mandate is a ballot initiative, and not state legislation, this constitutional requirement does not apply. The Commission's determination of whether or not a program is state-mandated controls the application of section 6, subdivision (b). Contrary to the trial court's finding, the suspend-or-fund requirement does not impact the Commission's determination as to whether a program is state-mandated or mandated by the People through a ballot initiative.

As the Commission acknowledges, "the Legislature's ability . . . to suspend a state-mandate by defunding the program is not an element indicating whether a voter-enacted ballot measure constitutes a subsequent change in law . . . . Rather, the requirement to fund or suspend a mandated program under article XIII B, section 6[, subdivision] (b) [results from] the Commission's finding in a prior year that the program at issue constitutes a reimbursable state-mandated program."

37

DISPOSITION

The judgment is reversed. The trial court is directed to modify its judgment to issue a writ of mandate directing the Commission to set aside the decisions challenged in this action and to reconsider the test claim in a manner consistent with this opinion.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


NARES, J.